Herbert MILDNER, Plaintiff,

v.

Frank A. GULOTTA, Individually and as Presiding Justice, Appellate Division of the State of New York, Second Judicial Department, et al., Defendants.

Milton LEVIN, Plaintiff,

v.

Frank A. GULOTTA et al., Defendants.

Julius GERZOF, Plaintiff,

v.

Frank A. GULOTTA et al., Defendants.

Nos. 74 C 1101, 74 C 1668 and 74 C 1684.

United States District Court, E. D. New York.

Oct. 9, 1975.

Judgment Affirmed March 29, 1976. See 96 S.Ct. 1489.

**184**

Lippe, Ruskin & Schlissel, P. C., by Richard Lippe, Mineola, New York, for plaintiff Mildner.

Paul, Weiss, Rifkind, Wharton & Garrison, by Simon H. Rifkind, Mark A. Belnick, New York City, for plaintiff Levin.

Phillips, Nizer, Benjamin, Krim & Ballon, by Angelo T. Cometa, William, R. Reilly, New York City, for plaintiff Gerzof.

Louis J. Lefkowitz, Atty. Gen., by Samuel A. Hirshowitz, A. Seth·Greenwald, Daniel M. Cohen, New York City, for defendants.

Nicholas C. Cooper, Judicial Inquiry on Professional Conduct Amicus Curiae.

Before MOORE, Circuit Judge, WEINSTEIN and NEAHER, District Judges.

NEAHER, District Judge.

These three civil rights actions were brought under 42 U.S.C. § 1983 to test the constitutionality of the procedures used by the State of New York to discipline attorneys charged with professional misconduct. Each case involves an attorney who was recently disciplined by the New York Supreme Court, Appellate Division, Second Department (hereinafter "Appellate Division"), thereby raising similar claims of alleged denial of due process and the equal protection of the laws. The cases were consolidated for hearing, March 12, 1975, before this three-judge district court, convened following Judge Weinstein's order of October 23, 1974, in *Mildner v. Gulotta,* in which he concluded that the case was one which must be heard and determined by a statutory court under 28 U.S.C. § 2281.

Although subject matter jurisdiction exists on the basis of the pleadings and papers before us, we cannot accept the view that these plaintiff attorneys have made a case for relief here. With all respect for the Supremacy Clause, we do not construe § 1983 or our constitutional question jurisdiction as authorizing an inferior federal court to pass upon the procedure employed by the State courts to discipline attorneys who practice before them or to interfere with their judgments in such matters. Nor do we read the statute as in effect inserting a new form of federal review between the appellate courts of the State and the Supreme Court of the United States.

That is not to say that disciplined attorneys have no remedy. Rather, we believe that attorneys above all should know that the State courts expound and apply the Constitution and that if they do so erroneously, the remedy is to apply to the Supreme Court for review. That remedy appears not to have been sought here.

In our examination of the parties' submissions we have found no substantial merit in the plaintiffs' claims and conclude that the respective complaints should be dismissed. Judge Moore is of opinion that dismissal should be upon the merits for the reasons stated in his concurrence. In my view under prevailing standards of federalism and comity, abstention is more appropriate. Before explaining the reasons for our conclusions, a brief history of each of the disciplinary proceedings is in order, followed by our analysis of the statutory and procedural framework and the constitutional claims the plaintiffs have raised.

*Factual Background*

1. *Mildner*

The background facts, as stated in Judge Weinstein's earlier order and in the complaint, do not appear to be in material dispute. Mildner, an attorney duly licensed to practice in the State since 1959, maintains a law office in Brooklyn, New York. On October 4, 1972, the Appellate Division commenced disciplinary proceedings against Mildner following an investigation by the Second Department Judicial Inquiry on Professional Misconduct. Three charges of professional misconduct were filed against him. As summarized in the Appellate Division's final decision in the case, the first charge alleged a wrongful conversion to his own use of $17,430 entrusted to him by a personal friend, Roberta Evans, on the pretext that the money would thereby be protected from any claims by Mrs. Evans' husband in a pending divorce action. The second charge alleged that Mildner attempted to impede and obstruct the very Inquiry which investigated his conduct by attempting to persuade Mrs. Evans not to cooperate with the Inquiry, by inducing her to give a false statement of facts bearing on the investigation, by executing backdated promissory notes and a false affidavit in an effort to deceive the Inquiry, and by refusing to turn over certain physical evidence requested by the Inquiry. The third charge alleged that Mildner knowingly gave false testimony to the Inquiry.

On November 3, 1972, the Appellate Division designated the Hon. Albert S. McGrover, a Justice of the New York Supreme Court, as referee to hear and report on Mildner's alleged professional misconduct. Justice McGrover conducted extensive hearings on seven occasions between December 1972 and April 1973, compiling a record of more than 850 pages. In his 16-page written report of June 12, 1973, Justice McGrover found and concluded, *inter alia*, that Mrs. Evans had transferred the bulk of an inheritance from her mother's estate to Mildner "for safekeeping"; that with her consent he opened special accounts in his name to hold the funds for that purpose, giving her the passbooks; that thereafter without her knowledge he issued checks against insufficient funds for his own personal purposes which were later charged against Mrs. Evans, substantially depleting those accounts; and that Mildner's "manipulation of the funds and his failure to keep [Mrs.] Evans properly informed . . . deserves criticism." Nontheless the referee concluded that none of the charges against Mildner had been sustained by the evidence. Thereafter cross-motions, apparently fully briefed, were made in the Appellate Division to confirm and disaffirm the report.

On January 28, 1974, that Court, in a brief opinion, granted the motion to disaffirm the report and denied Mildner's motion to confirm after stating:

"In our opinion, contrary to the report, all three charges are fully sustained by the proof." [1]

---

1. *In re Mildner*, 43 App.Div.2d 350, 351, 352 N.Y.S.2d 13, 14 (2nd Dep't. 1974).

The Court went on to suspend Mildner for a period of three years commencing March 1, 1974, after adding:

> "In view of all the circumstances indicated by the record and considering the respondent's evident lack of candor and contrition, it is our opinion that suspension from the practice of law for a period of three years would be a suitable and appropriate discipline to be imposed upon the respondent."[2]

On March 7, 1974, the Appellate Division denied various motions by Mildner for a stay of the effective date of the suspension, leave to appeal, or reargument on the quantum of punishment imposed by the court. A motion was then made in the Court of Appeals seeking leave to appeal to that Court on three grounds: (1) a denial of due process in that the suspension order had been based on recanted testimony of an admitted perjured witness; (2) error in the Appellate Division's reversal of the referee's findings; and (3) a failure to establish the charges as a matter of law. This motion, fully briefed by both sides, was denied without opinion. *In re Mildner*, 34 N.Y.2d 516, 357 N.Y.S.2d 1025 313 N.E.2d 796 (May 9, 1974).

This action was filed July 25, 1974, and the Appellate Division stayed Mildner's suspension until November 1, 1974. Judge Weinstein's order of October 23, 1974, further stayed the suspension order until this court was convened. The stay has continued in effect since the hearing on March 12, 1975, pending determination of the action by this court.

Mildner raises several constitutional claims here. In his complaint, he alleges the deprivation of a valuable property right and privilege—his license to practice law and thereby earn a living, as well as his professional reputation—in violation of his rights to due process and the equal protection of the laws. The due process claim is grounded on the alleged failure of the State of New York to provide him an appeal as of right from the court of original jurisdiction in disciplinary proceedings. He adds that a denial of equal protection grows out of the fact that at least one appeal as of right from the court of original jurisdiction or determination of an administrative body is afforded all other litigants and every other person in the State of New York except disciplined attorneys.

Mildner also alleges a denial of due process in that his suspension was allegedly based on a record which lacked sufficient evidence to support the determination, and that the suspension was in connection with a matter involving a person with whom he was not in an attorney-client relationship. Finally, Mildner adds that the three-year suspension imposed was cruel and unusual punishment under the circumstances.

## 2. Levin

Plaintiff, Milton Levin, is an attorney admitted to the Bar of the State of New York in 1934. On November 17, 1971, the Appellate Division appointed Solomon A. Klein, Esq., to institute and prosecute a disciplinary proceeding against Levin on charges stemming from a 1970 Second Department inquiry conducted by Hon. Charles W. Froessel ("Froessel inquiry"), into the activities of former State Supreme Court Justice Michael M. D'Auria. During the Froessel inquiry, Levin had discussed with investigators certain transactions between D'Auria and his (Levin's) real estate partner, Maurice Gruber, had produced various documents, and had given testimony before the inquiry. The disciplinary petition, formally filed on April 18, 1972, charged that Levin had testified falsely when he stated that $30,000 in bonds transferred to D'Auria in 1967 was a loan, alleging that it was in reality part payment of a legal fee to D'Auria rendered in connection with a zoning application in Plainview, New York. With respect to Levin's production of documents, the petition charged that four admittedly backdated documents—a deed, a blank acknowledgment of it, a

2. *Id.*

promissory note, and one relating to a boat—were false and submitted deliberately to obstruct the inquiry.

On October 24, 1972, the Appellate Division designated the Hon. Morton B. Silberman, Justice of the New York Supreme Court, as referee to hear and report on Levin's alleged professional misconduct. Justice Silberman conducted extensive hearings on ten different days during December 1972 and January 1973. Following submission of post-hearing memoranda and oral argument, Justice Silberman concluded, in his 25-page written report dated August 31, 1973, that Levin was innocent of both charges, as they were not sustained by the evidence. Thereafter cross-motions, apparently fully briefed, were made in the Appellate Division to confirm and disaffirm the report. Levin's request for oral argument on the motions was denied.

On September 9, 1974, the Appellate Division, on the basis of the hearing and report of Justice Silberman, ruled upon the motions as follows:

> "In our opinion, contrary to the report, the first charge, insofar as it relates to a document dated March 6, 1967 involving the transfer of a Chris Craft boat, was sustained by the evidence. The reporting Justice's findings with respect to the remainder of the first charge and with respect to the second charge are confirmed." [3]

The Court thereupon ordered Levin suspended from the practice of law for three years.

On October 21, 1974, Levin sought leave to appeal to the New York Court of Appeals from the suspension order, a stay pending determination of the motion for leave to appeal, and an appeal as of right on the ground that his case presented substantial constitutional questions. Following the granting of an interim stay and the filing of Klein's fully briefed opposition, the Court of Appeals, on November 20, 1974, denied

without opinion Levin's motions, including apparently the request for an appeal as of right. 35 N.Y.2d 643, 362 N.Y.S.2d 1026, 321 N.E.2d 555 (1974).

This action was commenced on November 25, 1974. On December 16, 1974, Levin's motions for a temporary restraining order and the convening of a three-judge court were granted by Judge Weinstein. On December 19, 1974, the statutory court designated to hear *Mildner v. Gulotta* was designated to hear this case as well. The stay has continued in effect since the hearing on March 12, 1975, pending determination of the action by this court.

The constitutional claims Levin raises here are not dissimilar to Mildner's. The first is that New York Judiciary Law, § 90, violates the due process and equal protection clauses of the Fourteenth Amendment because, unlike all other professionals licensed by the State of New York, it affords an attorney no appeal as of right from an adverse decision in an attorney disciplinary proceeding. The other claims are all that § 90 violates the due process clause in various ways: it allows discipline to be imposed by the trier of fact without hearing the parties, observing the demeanor of the parties or witnesses, or hearing oral arguments of counsel; it empowers the Appellate Division, as trier of fact, to impose discipline without rendering a written statement of the evidence it relied upon or the reasons for its order, and without making any written findings of fact; and lastly, it empowers the Appellate Division to impose discipline on the basis of no evidence. In summary, Levin adds that he has been and will be deprived of valuable property rights, privileges or immunities (including his license to practice law and his professional reputation) in violation of the United States Constitution.

3. *Gerzof*

Plaintiff, Julius Gerzof, is an attorney admitted to the Bar of the State of New

---

3. *In re Levin*, 45 App.Div.2d 455, 359 N.Y.S.2d 77, 78 (2nd Dep't. 1974).

York in 1936. On April 18, 1972, the Appellate Division instituted disciplinary proceedings against him.

Two charges of professional misconduct were filed against Gerzof also relating to the Froessel investigation of Justice D'Auria. As summarized by the Appellate Division in its final decision in the case the first charge was soliciting and advising two other attorneys to reduce their legal fee on a zoning application so as to make available a sum of money to be used improperly to assure the granting of the applications. The second charge was that of testifying falsely at a Judicial Inquiry, where Gerzof denied committing the above solicitation.

On October 24, 1972, the Appellate Division designated the Hon. Morton B. Silberman, Justice of the New York Supreme Court, as referee to hear and report on Gerzof's alleged professional misconduct. Justice Silberman filed a report and a supplemental report in September 1973, after holding hearings on the charges against Gerzof, in which he concluded both charges had been sustained by the evidence. Thereafter cross-motions were made in the Appellate Division to confirm and disaffirm the report. Concluding that both charges were sustained by the evidence, that Court, on September 9, 1974, summarily confirmed the report and suspended Gerzof from the practice of law for a period of three years. *In re Gerzof*, 45 App.Div.2d 450, 359 N.Y.S.2d 76 (1974).

Leave to appeal to the Court of Appeals and a stay were thereafter denied by the Appellate Division. The order of suspension was extended, however, to allow Gerzof to seek such leave from the Court of Appeals. Following the granting of an interim stay and full briefing

of the motion in the Court of Appeals, that Court, on November 21, 1974, denied Gerzof's motions.

This action was commenced on November 27, 1974. On December 4, 1974, Gerzof's motions for a temporary restraining order and the convening of a three-judge court were granted. On December 19, 1974, the statutory court designated to hear *Mildner v. Gulotta* was designated to hear this case. The stay has continued in effect since the hearing on March 12, 1975, pending determination of the action by this court.

Among the several constitutional claims Gerzof raises here, his basic due process and equal protection claim, arising out of a denial of an appeal as of right from the court of original jurisdiction, is identical to Mildner's. His second claim is a further due process and equal protection assertion that his suspension was based upon a record insufficient as a matter of law to sustain the determination made against him. Finally, as in Mildner's case, Gerzof claims his three-year suspension, under all the circumstances, to be cruel and unusual punishment.

Mildner, Levin and Gerzof seek substantially the same relief here: a declaration that the State disciplinary procedure deprived them of constitutional rights and injunctive relief permanently enjoining defendants from suspending them from the practice of law in this State.

## The New York Disciplinary Procedure

The basic statutory framework which underlies attorney disciplinary proceedings is New York Judiciary Law § 90, the relevant portions of which are set forth in the margin.[4] Attorneys licensed

4. "§ 90. Admission to and removal from practice by appellate division; character committees

\* \* \* \* \*

"2. The supreme court shall have power and control over attorneys and counsellors-at-law and all persons practicing or assuming to practice law, and the appellate division of the supreme court in each department is au-

thorized to censure, suspend from practice or remove from office any attorney and counsellor-at-law admitted to practice who is guilty of professional misconduct, malpractice, fraud, deceit, crime or misdemeanor, or any conduct prejudicial to the administration of justice; and the appellate division of the supreme court is hereby authorized to revoke such admission for any misrepresentation or

to practice in this State are officers of the New York Supreme Court, and the statute contemplates that the four Appellate Divisions of that Court shall have exclusive jurisdiction in their re-respective Judicial Departments to say what constitutes professional misconduct. *Erie County Water Authority v. Western New York Water Co.*, 304 N.Y. 342, 107 N.E.2d 479, *cert. denied*, 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (1952). Suspension or removal of an attorney by any Appellate Division operates as a suspension or removal in every court of the State. N.Y. Judiciary Law § 90(3).

Subsection 6 of § 90 makes quite clear the obligation placed upon an Appellate Division to comply with procedural due process by, where possible, requiring personal delivery to the accused attorney of a copy of the charges against him, and allowing him an opportunity to be heard in his defense. The statute does not specify the nature and form of such hearing, or even who may conduct it. There is no doubt, however, that the ultimate responsibility for adjudicating

---

suppression of any information in connection with the application for admission to practice.

"It shall be the duty of the appellate division to insert in each order of suspension or removal hereafter rendered a provision which shall command the attorney and counsellor-at-law thereafter to desist and refrain from the practice of law in any form, either as principal or as agent, clerk or employee of another. In addition it shall forbid the performance of any of the following acts, to wit:

"a. The appearance as an attorney or counsellor-at-law before any court, judge, justice, board, commission or other public authority.

"b. The giving to another of an opinion as to the law or its application, or of any advice in relation thereto.

"In case of suspension only, the order may limit the command to the period of time within which such suspension shall continue, and if justice so requires may further limit the scope thereof.

"If an attorney and counsellor-at-law has been heretofore removed from office, the appellate division shall upon application of any attorney and counsellor-at-law, or of any incorporated bar association, and upon such notice to the respondent as may be required, amend the order of removal by adding thereto as a part thereof, provisions similar to those required to be inserted in orders hereafter made.

"If a certified copy of such order or of such amended order, be served upon the attorney and counsellor-at-law suspended or removed from office, a violation thereof may be punished as a contempt of court.

&ast; &ast; &ast; &ast;

"6. Before an attorney or counsellor-at-law is suspended or removed as prescribed in this section, a copy of the charges against him must be delivered to him personally within or without the state or, in case it is established to the satisfaction of the presiding justice of the appellate division of the supreme court to which the charges have been presented, that he cannot with due diligence be served personally, the same may be served upon him by mail, publication or otherwise as the said presiding justice may direct, and he must be allowed an opportunity of being heard in his defense. In all cases where the charges are served in any manner other than personally, and the attorney and counsellor-at-law so served does not appear, an application may be made by such attorney or in his behalf to the presiding justice of the appellate division of the supreme court to whom the charges were presented at any time within one year after the rendition of the judgment, or final order of suspension or removal, and upon good cause shown and upon such terms as may be deemed just by such presiding justice, such attorney and counsellor-at-law must be allowed to defend himself against such charges.

"The justices of the appellate division in any judicial department, or a majority of them, may make an order directing the expenses of any disciplinary proceedings, and the necessary costs and disbursements of the petitioner in prosecuting such charges, including the expense of any preliminary investigation in relation to professional conduct of an attorney and counsellor-at-law, to be paid by the county treasurer of a county within the judicial department, which expenses shall be a charge upon such county.

&ast; &ast; &ast; &ast; &ast;

"8. Any petitioner or respondent in a disciplinary proceeding against an attorney or counsellor-at-law under this section, including a bar association or any other corporation or association, shall have the right to appeal to the court of appeals from a final order of any appellate division in such proceedings upon questions of law involved therein, subject to the limitations prescribed by articles six, section seven, of the constitution of this state."

disciplinary proceedings rests with the several Appellate Divisions, subject only to limited appeal to the New York Court of Appeals in certain classes of cases.

Subsection 8 of § 90 expressly provides that either petitioner or respondent may appeal as of right from a final Appellate Division order in a disciplinary proceeding "upon questions of law involved therein," subject only to certain limitations on the appellate jurisdiction of the Court of Appeals in the New York Constitution, Article 6, § 3.[5] Under those limitations the present practice appears to be that, for cases such as these, decided originally and unanimously by the Appellate Division, an appeal as of right exists only when there is directly involved the construction of the constitution of this State or of the United States, CPLR § 5601(b)(1). Otherwise, appeal is by permission of the Appellate Division or the Court of Appeals, CPLR § 5602(a). See *Javits v. Stephens,* 382 F.Supp. 131, 140–42 (S.D. N.Y.1974). And the Court of Appeals has construed "directly involved" not to include due process questions arising out of the Appellate Division decision and not "necessarily involved in the decision of the case." *Id.* at 142. See *Fryberger v. N. W. Harris Company, Inc.,* 273 N.Y. 115, 6 N.E.2d 398 (1937); *cf. Matter of Levy,* 255 N.Y. 223, 174 N.E. 461 (1931).

Under the current rules of the Appellate Division, Second Department, that Court normally institutes disciplinary proceedings upon the recommendation of a duly constituted joint bar association grievance committee, which has the power to conduct a preliminary inquiry into a specific complaint of professional misconduct. See Rules of the Supreme Court, Appellate Division, Second Department § 691.4 (McKinney Supp.1975).

It appears to be a long-standing practice of the Appellate Divisions, once formal disciplinary proceedings are instituted, to refer the proceedings to a referee to hear and report.[6] Referees appear to be of two types, although their powers seem to be roughly coextensive. The first is the Official Referee, as denominated in the Judiciary Law §§ 114 *et seq.* The second is the Referee to Inquire and Report, CPLR §§ 4001, 4201, 4212, 4320. In either case the referee conducts a hearing, and thereafter files a report which sets forth his findings of fact and conclusions of law thereon. Following the filing of the transcript and his report with the Appellate Division, that Court, upon motion of either party, or on its own initiative, may confirm or disaffirm the report in whole or in part, may make new findings with or without taking additional testimony, and may order a new hearing. CPLR § 4403. *Cf.* CPLR § 5501(c); Weinstein-Korn-Miller ¶ 5501.20.

These statutory provisions have led to holdings to the effect that findings and conclusions by the referee in disciplinary proceedings are in no way binding on the Appellate Division, which must itself determine whether or not the charges have been sustained. *E. g., In re Broome,* 13 A.D.2d 657, 213 N.Y. S.2d 821, 822 (2d Dep't), *rev'd on other grounds,* 10 N.Y.2d 942, 224 N.Y.S.2d 21, 179 N.E.2d 862 (1961). This does not mean, however, that the referee's findings and conclusions are inconsequential. Since he has the opportunity to observe the witnesses and determine credibility, his decision is entitled to serious consideration by the Appellate Division. *In re Gondelman,* 258 App.Div. 1085, 18 N.Y.S.2d 52 (2d Dep't), *modified on other grounds,* 259 App.Div. 889, 20 N. Y.S.2d 410, *aff'd,* 285 N.Y. 624, 33 N.E. 2d 553 (1941). But even on credibility

---

5. Previously Article 6, § 7.

6. See *In re Jones,* 159 App.Div. 782, 145 N.Y.S. 65 (1st Dep't. 1913), where in denying an attorney's request that an Official Referee appointed to hear and report be removed, the

Court stated that "he was appointed an official referee, under the provisions of the law, to whom this court was authorized to refer proceedings of this character." *Id.,* 145 N.Y.S. at 66.

questions, the Appellate Division may, and has, substituted its judgment on occasion for that of the referee. *E. g., In re Kahn*, 38 A.D.2d 115, 123, 328 N.Y.S. 2d 87, 95–96 (1st Dep't), *aff'd*, 31 N.Y. 2d 752, 338 N.Y.S.2d 434, 290 N.E.2d 435 (1972).

A few other points about the procedures used in disciplinary cases are worthy of note. First, rejection of the referee's findings need not be predicated on the conclusion that they were clearly erroneous. Second, on the motions to confirm and disaffirm, there does not appear to be any obligation to afford an oral hearing or oral argument concerning adoption, modification, or rejection of the report. Third, in practice, if not in law, there appears to be no obligation on the Appellate Division to make appropriate findings or state its reasons when it does not agree with the referee. It appears that all that is deemed necessary in this regard is a summary statement reaching an opposite conclusion of law as to whether a particular charge was sustained by the evidence adduced at the hearing. Fourth, as a referee appointed to hear and report, the referee has no power to *determine;* [7] in particular, he has no power to dismiss the charges, even if he should find them unsupported by the evidence. See *In re O'Neill*, 184 App.Div. 75, 80, 171 N.Y.S. 514 (1st Dep't 1918).

*Plaintiffs' Constitutional Claims*

■ To put the claims raised here in proper perspective, it is necessary to focus more closely on the precise nature of attorney disciplinary proceedings. We have been instructed, in somewhat cryptic fashion, that they are "of a quasi-criminal nature." *In re Ruffalo*, 390 U.S. 544, 551, 88 S.Ct. 1222, 20 L. Ed.2d 117 (1968); *Erdmann v. Stevens*, 458 F.2d 1205, 1210 (2 Cir. 1972). As previously indicated, we must view disciplinary proceedings as *judicial* rather than *administrative* in nature. *Id.* at 1208–09.

Perhaps the most important element of such proceedings, and that which gives them their unique status, is the universal recognition that the same court before whom attorneys, acting as its officers, are admitted and practice is the tribunal which must sit in judgment of charges of professional misconduct against them. There can be no doubt about such a court's inherent power of autonomous control over the conduct of its officers.[8] Disciplinary proceedings, while perhaps susceptible to such a label as "quasi-criminal" or to such a terse description as "comparable to a criminal rather than to a civil proceeding," *id.*, 458 F.2d at 1209, are in reality neither. *In re Ming*, 469 F.2d 1352, 1353 (7 Cir. 1972). As the *Ming* court put it,

> " '[s]uch proceedings are not lawsuits between parties litigant but rather

---

7. See CPLR § 4301 *et seq.*

8. The point was well summarized by the Second Circuit in *Erdmann*:
"The court alone admits an applicant to practice before it. Thereupon he becomes an officer of the court. The power to discipline, like the power to admit an applicant to membership of the bar, rests exclusively with the court. *Theard v. United States*, 354 U.S. 278, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957); *People ex rel. Karlin v. Culkin*, 248 N.Y. 465, 162 N.E. 487 (1928). The nature of the relationship between the court and attorneys admitted to practice before it was summarized by Justice Frankfurter, speaking for a unanimous court in *Theard*:
" 'The two judicial systems of courts, the state judicatures and the federal judiciary, have autonomous control over the conduct of

their officers, among whom, in the present context, lawyers are included. The court's control over a lawyer's professional life derives from his relation to the responsibilities of a court. The matter was compendiously put by Mr. Justice Cardozo, while Chief Judge of the New York Court of Appeals. " 'Membership in the bar is a privilege burdened with conditions' (*Matter of Rouss*, 221 N.Y. 81, 84, 116 N.E. 782, 783). The appellant was received into that ancient fellowship for something more than private gain. He became an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice." *People ex rel. Karlin v. Culkin*, 248 N.Y. 465, 470–471, 162 N.E. 487, 489.' (354 U.S. 278, 281, 77 S.Ct. 1274, 1276, 1 L.Ed.2d 1342.)" 458 F.2d at 1208–09.

are in the nature of an inquest or inquiry as to the conduct of the respondent. They are not for the purpose of punishment, but rather seek to determine the fitness of an officer of the court to continue in that capacity and to protect the courts and the public from the official ministration of persons unfit to practice. *Ex parte Wall*, 107 U.S. 265, 2 S.Ct 569, 27 L.Ed. 552 (1882). Thus the real question at issue in a disbarment proceeding is the public interest and an attorney's right to continue to practice a profession imbued with public trust. *In re Fisher*, 179 F.2d 361 (7th Cir. 1950), cert. denied sub nom. *Kerner, et al. v. Fisher*, 340 U.S. 825, 71 S.Ct. 59, 95 L.Ed. 606 (1950).' " *Id.*

Of course the public interest in a professional and ethical bar is not the only interest at stake in disciplinary proceedings. The sanctions involved can amount to loss of livelihood and professional reputation. See *Erdmann v. Stevens, supra*, 458 F.2d at 1209–10; *In re Ming, supra*, 469 F.2d at 1355. These are such drastic consequences for the individual attorney that the State's power to divest one of a license to practice law may not abrogate federally protected rights. *Erdmann v. Stevens, supra*, 458 F.2d at 1210; *In re Ming, supra*, 469 F.2d at 1355. See *Johnson v. Avery*, 393 U.S. 483, 490 n. 11, 89 S.Ct. 747, 21 L. Ed.2d 718 (1969). *Cf. Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 736, 42 L.Ed. 2d 725 (1975).

At the same time, however, the license to practice law in a particular State is so local in nature, even to the point of localized admission to practice before the various courts, that federal constitutional standards have not altered the traditionally wide discretion afforded State courts "in the establishment and application of standards of professional conduct and moral character to be observed by their court officers." *Erdmann v. Stevens, supra*, 458 F.2d at 1210. See also *Tang v. Appellate Division*, 487 F.2d 138, 143 (2 Cir. 1973). This def-

erence arises out of a recognition of the special relationship between the attorney and the court which grants him a license to practice before it, so well summarized by Judge MacMahon:

"The intimate and delicate relationship between courts and lawyers has long justified the judiciary's careful scrutiny of the integrity and qualifications of those who practice before it. Thus, it would be peculiar, if not unreasonable, for the New York Legislature to place responsibility for disciplining attorneys and review of disciplinary proceedings elsewhere than in the courts. No other body is as well qualified or as interested in determining whether an attorney is qualified to practice law." *Javits v. Stevens, supra*, 382 F.Supp. at 141.

This analysis of the situation has not changed with the passage of time. As Mr. Chief Justice Marshall perceived it over a century and a half ago:

"On one hand, the profession of an attorney is of great importance to an individual, and the prosperity of his whole life may depend on its exercise. The right to exercise it ought not to be lightly or capriciously taken from him. On the other, it is extremely desirable that the respectability of the bar should be maintained, and that its harmony with the bench should be preserved. For these objects, some controlling power, some discretion, ought to reside in the Court. This discretion ought to be exercised with great moderation and judgment; but it must be exercised; and no other tribunal can decide, in a case of removal from the bar, with the same means of information as the Court itself. If there be a revising tribunal, which possesses controlling authority, that tribunal will always feel the delicacy of interposing its authority, and would do so only in a plain case.

\* \* \* \* \* \*

"The power is one which ought to be exercised with great caution, but which is, we think, incidental to all Courts,

and is necessary for the preservation of decorum, and for the respectability of the profession."

*Ex parte Burr,* 22 U.S. (9 Wheat.) 529, 530–31, 6 L.Ed. 152 (1824); see *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 378, 18 L.Ed. 366 (1867).

### 1. *The Equal Protection Claim*

As we understand this claim, the alleged differing treatment is the denial to disciplined attorneys of the right to the full scope of appellate review afforded to all other "litigants," and, in particular, all other "professionals" whose licenses to practice are revoked or suspended. There is no dispute that appeals as of right are quite limited in attorney disciplinary cases. Since the Appellate Divisions sit as courts of original jurisdiction in these cases, they cannot act in their traditional or more usual capacity as the court of primary appellate jurisdiction. In fact, as all parties stressed at oral argument, when the Appellate Division acted on the referees' reports, it was *not* functioning in an appellate capacity. Instead, the Court of Appeals is the sole court of appellate jurisdiction in these cases, and is so as of right only for certain cases or questions as summarized above. In contrast, decisions which find other New York licensed professionals guilty of professional misconduct are subject to much broader appellate review.[9]

■■ While it is true that where the right to an appeal is afforded some litigants and capriciously and arbitrarily denied to others, there is a violation of the Equal Protection Clause, *Lindsey v. Normet,* 405 U.S. 56, 77, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), identification of differing treatment is only the beginning of an equal protection inquiry. There must be recognition that, in disciplining professionals, the State may legitimately find reason to conclude that differing procedural safeguards are appropriate for different professions. See *Semler v. Oregon State Board of Dental Examiners,* 294 U.S. 608, 610–11, 55 S.Ct. 570, 79 L.Ed. 1086 (1935); *Pordum v. Board of Regents of State of New York,* 491 F.2d 1281, 1286 (2 Cir. 1974). Thus there is no equal protection problem when the denial of appellate rights to attorneys to the same extent afforded other professionals or litigants is reasonable, resting "upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." [10]

■ We have no difficulty finding this standard of constitutionality adequately met in this case. We agree with the reasoning of Judge MacMahon in *Javits, supra,* wherein he concluded there was no denial of equal protection in New York's failure to make Article 78 review proceedings available to attorneys. The claim here is no more than another facet of the one made in *Javits;* it makes no difference whether one focuses on the disparity itself or on the various means of redressing it.

■ As described above, the discipline of attorneys is a special responsibility which, ultimately, must rest with the courts. The New York legislature has decided that it is best for the judicial body which licenses attorneys to function also in situations where the right to continued use of that license is properly called into question. Thus, the vesting of original jurisdiction with the Appel-

---

9. As pointed out in Appendix C to Levin's Brief, the New York Board of Regents, under N.Y. Education Law § 6510(3), acts as the statutory trier-of-fact in all cases involving charges of professional misconduct of physicians, chiropractors, engineers, accountants and other licensed professionals covered by Education Law § 6500 *et seq.* Review of such decisions lies with the Appellate Division, Third Department, pursuant to CPLR,

Article 78. N.Y. Education Law § 6510 (4). Article 78 provides for review by the court of, *inter alia,* determinations affected by an error of law. CPLR § 7803(3), or not supported by substantial evidence on the entire record, CPLR § 7803(4).

10. *Javits v. Stevens, supra,* 382 F.Supp. at 140, *quoting from F. S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920).

**194**

late Divisions over disciplinary matters is of itself no denial of equal protection.

■ Nor is the denial of an appeal as of right on all questions of law or fact arbitrary or capricious. Having vested the initial determination function with the courts rather than an administrative agency, the legislature might well have concluded that the obligatory judicial review normally—if not presumptively—required for administrative decisions was not required when the *initial* determination was by a court.[11] The legislature has apparently concluded that when there is no division of opinion among the several Appellate Division judges who rule finally on a disciplinary matter, the Appellate Division's findings and conclusions, to the extent they do not involve constitutional questions, are to be conclusive, at least to the extent the losing party is unable to convince either the Court of Appeals or the appropriate Appellate Division to afford a discretionary appeal.

■ While the plaintiffs have made much of the unfairness of this approach as opposed to the arguable wisdom of some procedure that would afford a fuller appellate review, the Equal Protection Clause was not meant to strike down legislative classifications that are merely unwise, improvident or capable of improvement. Here the legislature may well have concluded it was necessary to entrust the grave responsibility for final adjudications of what constitutes professional misconduct to a judicial body in the first instance, and to provide a forum of no less stature than the Appellate Division. And the legislature has required the Court of Appeals, consistent with its constitutional limitations in other cases, as well as its crowded docket, to provide obligatory review of such final decisions only to the extent previously indicated. In sum, the judicial bodies best suited to finally adjudicate the issues that arise in cases of this nature do just that in a manner that could by no stretch of logic be called arbitrary or capricious. We agree with the court in *Javits* that there is no violation of equal protection in the procedure adopted by New York for the review of disciplinary proceedings. 382 F. Supp. at 141.

### 2. The Due Process Claim

Plaintiffs challenge the Appellate Division's procedures under Judiciary Law § 90 as constitutionally defective in failing to afford accused attorneys a full, fair and meaningful opportunity to be heard by the statutory trier-of-fact. More specifically, they complain (1) that beyond submission of written briefs, there is no opportunity to have the parties or witnesses heard by the body charged with the adjudicative responsibility; (2) there is no requirement, when a referee's conclusion exonerating an attorney is summarily disaffirmed, that either the reasons for disaffirmance be stated or that written findings of fact be made by that court; and (3) there is no appeal as of right from an adverse decision of the court of original jurisdiction. These defects in procedure they claim brought about their suspensions on the basis of no evidence.

■ All of the criticized features appear to be present in disciplinary procedures in the Second Department, which are ostensibly conducted in compliance with § 90(6) of the Judiciary Law. Section 90, we note, is plainly not unconstitutional on its face and does, in f..... appear to comport with traditional tions of due process. The critical que tion is whether it can truly be said tha any of those procedural features operates to deny accused attorneys a fundamentally fair hearing of the charges against them, thereby resulting in an unconstitutional application of the statute. We think not.

---

11. See K. Davis, Administrative Law Text § 28.02 (presumption of reviewability of administrative action), § 16.03 (outlining the distinctions between appellate review of judicial action and judicial review of administrative action) (1972).

First, while we agree that the opportunity to hear and observe the demeanor of witnesses is an essential element in the weighing and appraising of testimony, see *Wingo v. Wedding,* 418 U.S. 461, 94 S.Ct. 2842, 2850, 41 L.Ed.2d 879 (1974), its importance diminishes when facts are developed and inferences may be drawn without reference to credibility. As already pointed out, a disciplinary proceeding is not a full-blown trial but an inquest—a gathering of facts concerning the *conduct* of an attorney, a subject more likely to be illuminated by the evidence of the attorney's own acts than by what is said or not said by someone else. The referee's report in the *Mildner* case exemplifies the precise situation in which the documented evidence of the attorney's questionable financial transactions with another's money far outweighed the vacillating testimony of the complaining victim.

Nor, in our opinion, is it constitutionally required that the Appellate Division as final arbiter of the facts have personally heard the accused attorneys or other witnesses or have allowed oral argument upon the motions to confirm or disaffirm the referees' reports. The use of masters or referees as advisory triers-of-fact is a well-established instrument of busy appellate courts exercising original jurisdiction. The Supreme Court itself utilizes the practice when disputed factual issues appear in original actions. R. Stern & E. Gressman, Supreme Court Practice, Sec. 10.12 at 407–08 (4th ed. 1969). Although oral argument to the Court is allowed on the master's report in such matters, *id.,* this is not ordinarily the case in disbarment proceedings. See *In re Capshaw,* 65 S. Ct. 673 (1945), and 67 S.Ct. 1345 (1947);

*In re Crow,* 359 U.S. 1007, 1008, 79 S.Ct. 1152, 3 L.Ed.2d 1025 (1959) (Douglas, J., dissenting opn.); Stern & Gressman, *supra,* Sec. 19.5.

Second, with respect to the criticism that the court provided no reasons or new findings in overruling the referees in the *Mildner* and *Levin* cases, we have not been referred to and are unaware of any authority for the proposition that the absence of such a statement in a *judicial* context offends due process. The rule in administrative law cases, many of which are cited by plaintiffs,[12] is of little help in disciplinary proceedings. Special factors applying to administrative proceedings which call for a written statement of findings and reasons are not present here. See K. Davis, Administrative Law Text §§ 16.03, 16.07 (1972).

However terse the Appellate Division's decisions in these cases, they made it clear that that Court disagreed with the respective referees' ultimate conclusions in *Mildner* and *Levin* as to what the compiled evidence showed on the issue of professional misconduct— a mixed question of law and fact as to which the Appellate Division is the statutory arbiter. That the final decision was adverse to the attorneys is not evidence that the court reached it in a manner incompatible with due process.

Third, with respect to the criticized denial of appeal as of right, there is abundant authority for the proposition that outright denial or abridgment of independent, obligatory appellate review of judicial decisions is not a denial of due process. If this is so even in criminal cases,[13] it is *a fortiori* so in "quasi-criminal" cases such as these, *Javits v. Stevens, supra,* 382 F.Supp. at 140.

12. See *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (statement of reasons in welfare benefit termination decisions); *Morrissey v. Brewer,* 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (similar statement in parole revocation decisions); *United States ex rel. Johnson v. Chairman, New York State Board of Parole,* 363 F.Supp. 416, 419 (E.D.N.Y.1973) (denial of parole); *Miller v. Iowa State ASCS Committee,* 374 F.Supp. 415, 419 (S.D.Iowa 1974) (termination of employment of government employees). See also *Thomas v. Ward,* 374 F.Supp. 206, 211 (M.D.N.C.1974).

13. See authorities collected in *Javits v. Stevens, supra,* 382 F.Supp. at 140 n. 29.

Finally, as to the claim of suspension on the basis of no evidence, we agree with the Attorney General that it appears to be an attempt to relitigate the merits of the State proceedings. Into that area we may not intrude. As Judge MacMahon aptly noted in *Javits v. Stevens, supra,* a review of State court proceedings for possible constitutional error lies exclusively in the jurisdiction of the Supreme Court. 382 F.Supp. at 137. More specifically, § 1983 does not extend the right to relitigate in a federal district court *evidentiary.* questions which have been adjudicated on the merits in State proceedings, upon the claim that there was no evidence to support the State action. *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 1001–03, 43 L.Ed. 2d 214 (1975).

We would therefore reject those claims raised in the *Mildner* and *Gerzof* complaints which suggest that the lack of evidentiary basis for the decisions was itself a denial of due process or equal protection, or constituted, when the resultant discipline was decreed, cruel and unusual punishment. See, *e. g., MacKay v. Nesbett,* 412 F.2d 846 (9 Cir.), *cert. denied,* 396 U.S. 960, 90 S.Ct. 435, 24 L. Ed.2d 425 (1969); *Jones v. Husle,* 391 F.2d 198 (8 Cir.), *cert. denied,* 393 U.S. 889, 89 S.Ct. 206, 21 L.Ed.2d 167 (1968); *Ginger v. Circuit Court,* 372 F.2d 621 (6 Cir.), *cert. denied,* 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 998 (1967); *In re Rhodes,* 370 F.2d 411 (8 Cir.), *cert. denied,* 386 U.S. 999, 87 S.Ct. 1321, 18 L. Ed.2d 349 (1967); *Clark v. State of Washington,* 366 F.2d 678 (9 Cir. 1966); *Gately v. Sutton,* 310 F.2d 107 (10 Cir. 1962); *Saier v. State Bar of Michigan,* 293 F.2d 756 (6 Cir.), *cert. denied,* 368 U.S. 947, 82 S.Ct. 388, 7 L.Ed.2d 343 (1961).

### Abstention

As noted at the outset, and for the reasons outlined, these cases, in the writer's opinion, especially call for dismissal on the ground of abstention. I find additional support for this conclusion in the Court's reasoning in *Huffman v. Pursue, Ltd.,* 592 U.S. 420, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). Read narrowly, that case held that the standards stated in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), must be met to justify federal intervention in a State judicial proceeding as to which a losing litigant has not exhausted his State appellate remedies. Subsequent cases leave no doubt that this decision reaches pending New York disciplinary proceedings. *Anonymous v. Association of the Bar of the City of New York,* 515 F.2d 427 (2 Cir.), *petition for cert. filed,* 44 U.S.L.W. 3005 (U.S. July 2, 1975) (No. 75–10); *Anonymous J. v. Bar Association of Erie County,* 515 F.2d 435 (2 Cir.), *petition for cert. filed,* 44 U.S.L.W. 3001 (U.S. June 26, 1975) (No. 74–1642).[14] See also *Wallace v. Kern,* 520 F.2d 400 (2 Cir. 1975).

I do not agree with plaintiffs' contention that these cases are readily distinguishable from the principles enunciated in *Huffman* simply because the disciplinary proceedings involved here are no longer "pending" at some level of the State courts. Had all the claims raised here been raised in the State courts—which they apparently were not—and finally decided adversely to plaintiffs, a direct appeal would lie as a matter of right to the United States Supreme Court under 28 U.S.C. § 1257 (2). *Huffman v. Pursue, Ltd., supra,* 95 S.Ct. at 1209. Moreover, issuing a stay of a final judgment of a State court is at least as significant an intrusion into State matters as enjoining prosecution of disciplinary proceedings prior to judgment. See 95 S.Ct. at 1210. In noting that the standards of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), may not be avoided by simply failing to perfect an appeal, *Huffman* also makes clear that the exhaustion doctrine makes no exception for

---

14. This result had been settled law in this Circuit even prior to *Huffman. Erdmann v. Stevens, supra.*

those who avoid raising constitutional issues the State courts are empowered—indeed obliged—to consider. See 95 S.Ct. at 1211 n. 22.

Plaintiffs also argue, not without some force, that their constitutional claims concerning denial of an appeal as of right were hardly ripe until obligatory review had in fact been denied by the New York Court of Appeals. They question the need or justice of requiring them to make what they believe to be futile motions for reargument on the constitutional claims such a denial raised. Even a timely motion for reargument would be raising a "new point" of which the parties could not be assured consideration.[15] But any properly raised challenge to Judiciary Law § 90—short of an express refusal by the Court of Appeals to reach the issue [16]—would support an appeal to the Supreme Court under 28 U.S. C. § 1257(2), even if the claims were not explicitly rejected by the Court of Appeals. See R. Stern & E. Gressman, Supreme Court Practice, Sec. 3.4 at 85 (4th ed. 1969).

■ While plaintiffs' arguments are not without attraction, I am persuaded that close analysis of *Huffman* and other authorities mandates abstention in each of these cases. In *Huffman*, appellee Pursue, Ltd., was a defendant in a State court nuisance proceeding, brought under the Ohio public nuisance statute by the county sheriff and prosecuting attorney, appellants *Huffman, et al.*, for the display of allegedly obscene films. Pursue lost at the trial court level and failed to appeal, electing instead to proceed as a plaintiff in the federal district court under 42 U.S.C. § 1983, attacking the constitutionality of the nuisance statute on First Amendment grounds. In reversing the three-judge district court's decision

granting Pursue injunctive relief, the Court held that even though the State trial court's decision had obviously become final and nonappealable,

> "the District Court should have applied the tests laid down in *Younger* in determining whether to proceed to the merits of appellee's prayer for relief . . . .." 95 S.Ct. at 1209–10.

■ *Huffman* must thus be read as holding that federal plaintiffs who actually are *involuntary* State defendants, and who have a constitutional defense arising out of State actions, cannot resort to a federal forum prior to seeking a State resolution of the merits of their constitutional claim. It is therefore apparent that the *Huffman* and *Anonymous* cases, *supra*, are not distinguishable merely because an appeal is no longer pending in the State courts in any of these cases.

It might be thought that this reasoning is inapplicable to the situation here, where the constitutional claim goes to the adequacy of the very procedures to which we would otherwise defer. The argument is not without factual support in the *Huffman* and *Anonymous* cases,[17] but must be rejected here. In so concluding, I consider *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), and *Lombard v. Board of Education*, 502 F.2d 631, 636 (2 Cir. 1974), *cert. denied*, 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975), to be inapposite.

*Gibson* involved a due process claim of bias in an administrative tribunal. The Court held that resort to the federal courts during the pendency of the administrative proceedings was not precluded by *Younger*, where the competency of the tribunal was the predicate of the constitutional (due process) issue involved. As the Court noted, *Younger* ab-

---

15. Within 90 days of the court's decision. Rule 500.9(b) of the Rules of the New York Court of Appeals.

16. See *Garrity v. New Jersey*, 385 U.S. 493, 495–96, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

17. The constitutional claim in *Huffman* is outlined in the text, *supra*. In both *Anonymous* cases, the constitutional claim was whether the Fifth Amendment permits the use of an attorney's immunized grand jury testimony as a basis for disciplinary proceedings.

stention "presupposes the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved." 411 U.S. at 577, 93 S.Ct. at 1697. Subsequently, however, the Court strongly suggested that the result in *Gibson* turned primarily upon the fact that the proceedings were *administrative* in nature. See *Huffman v. Pursue, Ltd., supra,* 95 S.Ct. at 1203; *Anonymous v. Association of the Bar of the City of New York, supra,* 515 F.2d at 432–33 n. 3.

Here the proceedings in the State courts, as they were in *Huffman,* are undeniably *judicial* in nature, *Erdmann v. Stevens, supra,* 458 F.2d at 1208–09, an important feature of the exhaustion requirement. In *Huffman* the Court, citing the Supremacy Clause, rejected any suggestion that in judicial proceedings "state judges will not be faithful to their constitutional responsibilities." 95 S.Ct. at 1211; see *Anonymous v. Association of the Bar of the City of New York, supra,* 515 F.2d at 435. This conclusion has even more force when the claim here, unlike *Gibson,* is not one of actual bias in the State judiciary or proceedings, but one of procedural inadequacy. We see no reason why State court judges are not competent to pass on the constitutionality of their own procedures, including a claimed unfair denial of obligatory review.

*Lombard, supra,* another pre-*Huffman* case, applied the principle that 42 U.S.C. § 1983 provides a "federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked," citing *Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961). Lombard, a dismissed probationary employee, had elected in the first instance to bring an Article 78, CPLR, proceeding in the State courts, seeking reinstatement as a teacher. Following an adverse decision on the merits, which became final after his appeal, Lombard brought his § 1983 action in the federal courts, raising for the first time procedural due process issues not dissimilar to those raised here.

Lombard's situation is thus distinguishable from the attorneys in the instant cases only in the sense that Lombard was not an involuntary State defendant but a voluntary plaintiff who made his own election to preserve his federal claims for a federal forum. But as indicated above, I read *Huffman* as having made this distinction crucial; as a defendant in a State proceeding, the only way Pursue could "preserve" its federal claim was to raise it in the State forum. As the dissent noted, "the mere filing of a complaint against a potential § 1983 litigant forces him to exhaust state remedies." *Huffman v. Pursue, Ltd., supra,* 95 S.Ct. at 1215 (Brennan, J., dissenting); see *id.,* 95 S.Ct. at 1211 n. 21. Moreover, *Lombard* did not deal with the *Younger* abstention issue itself, but only with the broader question of whether or not Lombard's failure to raise the constitutional claims in the State forum precluded his raising them in the federal forum on grounds of waiver, collateral estoppel, or res judicata.[18]

In concluding that we ought to abstain in these cases I am not unmindful that it would be more expeditious for all concerned if this court, now well familiarized with the issues raised, were to rule on the merits of the claims, from which a direct appeal to the Supreme Court would lie, 28 U.S.C. § 1253, *MTM, Inc. v. Baxley,* 420 U.S. 799, 95 S.Ct. 1278, 1281, 43 L.Ed.2d 636 (1975), rather than relegate plaintiffs to State remedies which may no longer exist. But expedience cannot overcome the principle that, for sound policy reasons tied to the unique and peculiarly State-oriented function attorney disciplinary proceedings serve,

---

18. Indeed, as the court pointed out, Lombard did the right thing if he preferred a federal forum to litigate his federal claims, for had he raised them in the State courts and lost, he could not relitigate them in the federal forum. 502 F.2d at 636–37, citing *Thistlethwaite v. City of New York,* 497 F.2d 339 (2 Cir. 1974).

*Erdmann v. Stevens, supra,* 458 F.2d at 1210; *Anonymous v. Association of the Bar of the City of New York, supra,* 515 F.2d at 432, the federal courts must be extraordinarily reluctant to interject themselves into such proceedings. Therefore, although agreeing that the plaintiffs' constitutional claims are without merit, I believe these cases call for the application of the *Younger* abstention rule and should be dismissed on that ground.

The Clerk is directed to enter judgment dismissing the complaints. Since serious procedural and substantive issues are presented, we unanimously agree that the stays previously entered will be continued pending disposition on appeals.

So ordered.

MOORE, Circuit Judge (concurring).

I agree that the complaints herein should be dismissed, but I would dismiss on the merits and hold that New York's procedures for disciplining its attorneys are constitutional for the reasons stated in Judge Neaher's opinion.

The issues presented for court review are clear but the path towards their resolution may be beset by procedural road blocks. However, where the destination to be reached is so apparent, courts should be sufficiently flexible not to be thwarted by procedural technicalities. As previously stated, the case came before Judge Weinstein as a single Judge. He could have held that plaintiffs' complaints presented no issue ripe for federal intervention or adjudication and dismissed the complaints, which would have been appealable to the court of appeals or have held that a constitutional issue cognizable by the federal courts existed requiring the appointment of a three-judge court. Finding the latter issue present, he sought and obtained the appointment of such a court.

As that court, we have been afforded the benefit of lengthy briefs and heard oral argument by able counsel. In the present posture of the litigation we have the privilege of granting or denying the injunction requested and are assured under 28 U.S.C. § 1253 that any party may appeal to the Supreme Court from an order thereon of a "district court of three judges." A possible alternative is abstention. Since the constitutional question is of sufficient importance to be resolved by our highest court, superficially it would seem to make little difference what the outcome in this court might be. However, any such nonchalant approach is quickly foreclosed by recent admonitions of the Supreme Court itself.

In *MTM, Inc. v. Baxley,* 420 U.S. 799, 95 S.Ct. 1278, 43 L.Ed.2d 636 (1975), the Supreme Court considered the qualifications for appealability from a three-judge court which had been convened in a federal court action to enjoin enforcement of a State court injunction and to declare an Alabama nuisance statute unconstitutional. In view of the pendency of the State court action, the three-judge court applying the test of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed. 2d 669 (1971), concluded that federal court intervention would be improper. Because of the pendency of the State court cases and because of the failure to show the circumstances required by *Younger* to afford an exception to its rule, the three-judge court dismissed the complaint without prejudice to the State court proceedings but gave "no opinion as to the merits of these cases." *MTM, Inc. v. Baxley, sub nom. General Corporation v. Sweeton,* 365 F.Supp. 1182 (1973).

The appellant brought the case directly to the Supreme Court under 28 U.S.C. § 1253 and argued that *Younger* did not preclude relief. In its opinion *per curiam* that Court focused on the question of whether direct review under § 1253 was applicable "in the absence of three-judge court decision resting on resolution of the constitutional merits of a complaint." The Court recognized that:

"The conflicting decisions of this Court on the question of whether § 1253 jurisdiction attaches where a three-judge federal court fails to reach the merits of a constitutional claim for

injunctive relief do not provide a consistent answer to this question." (Citing cases) (420 U.S. 799, 95 S.Ct. 1278, at p. 1281, 43 L.Ed.2d 636).

The Court had decided the previous week (March 18, 1975) *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed. 2d 482 wherein it had considered at length "[t]he seriousness of federal judicial interference with state civil functions . . .", *id.* at 1208, and more than suggested that in such circumstances federal courts "should abide by standards of restraint." *Id.*

Our dilemma is further complicated by such statements as "[t]he issue of whether federal courts should be able to interfere with ongoing state proceedings is quite distinct and separate from the issue of whether litigants are entitled to subsequent federal review of state court dispositions of federal questions." *Id.* at 1209.

The final decision in *Huffman* was to remand for consideration by the District Court to consider whether the "irreparable injury" exception of *Younger* could be shown so as to give that court jurisdiction.

Turning again to *MTM, Inc. v. Baxley*, we are told that "a direct appeal will lie to this [the Supreme Court] Court under § 1253 . . . only where such order rests upon resolution of the merits of the constitutional claim presented below." (*MTM*, 95 S.Ct. at 1281.)

In an endeavor to analyze the effect of these decisions on the cases before us, it would seem that this three-judge court is put in the anomalous position, in order to enable the parties to appeal, of having to pass upon the merits of the constitutionality of New York's disciplinary statute in a proceeding in which federal intervention may not be permitted.

Procedural obstacles should not prevent the real issue from being decided, if possible. That issue is whether New York's authorization of the Justices of its respective Appellate Divisions to act as the disciplinary bodies over the conduct of its attorneys is unconstitutional because the prescribed procedures with respect to attorneys is different from that of other litigants, namely, as to all the features described at length by Judge Weinstein in his dissent. At this stage it would seem a needless expenditure of judicial energy to dissolve this court and remand (as in *MTM*) to the District Court "so that a fresh order may be entered and a timely appeal prosecuted to the Court of Appeals." (*MTM*, 95 S.Ct. at 1281.) Such courts would only be met by the same arguments which plaintiffs adequately present here.

On remand the plaintiffs could be told that they failed specifically to claim the unconstitutionality of the State's Judiciary Law § 90 procedure in their applications for leave to appeal to the New York Court of Appeals and that they had thereby deprived themselves of the opportunity to reach that court and the Supreme Court thereafter. Or the court might express the hope that they might be able to discover some procedure to start over again and ultimately to reach the Supreme Court. But why in a day when conservation of judicial effort is so important should the courts shy away from deciding the issue now before them. Despite the fact that federal intervention in a State's disciplinary procedures with respect to its attorneys would seem inappropriate, the talismanic words of *Younger* "irreparable injury" may be sufficient to justify a consideration of this case on its own merits.

Summary of Memorandum

I. New York Disciplinary Procedure — 202

II. Facts — 202
    Mildner — 202
    Levin — 203
    Gerzof — 204

III. Jurisdiction — 204
    A. Defendants Are Not Immune from Suit — 204
    B. Plaintiffs' Actions Are Not Barred — 205
    C. There is No Disruption of State Court Proceedings — 206
    D. State Court Supervision of Attorneys is Subject to United States Constitution — 207

IV. Due Process — 210
    A. The Right Generally — 210
    B. Meaningful Hearing by Trier of Fact — 212
      1. Right to Hearing by Trier of Fact — 212
        a. Evaluating Credibility of Witnesses — 212
        b. Right to Argue to Trier — 213
        c. Statement of Reasons for Decision — 215
          ██ Court of Original Jurisdiction — 215
          ██ Administrative Determination — 216
          ██ Appellate Review — 217
      2. Failure to Meet Due Process Trial Standard — 220
    C. Appellate Review — 223
      1. Due Process Requirement — 223
      2. Failure to Give Due Process at Trial or Appellate Level — 224

V. Equal Protection — 224
    A. Right to Appeal in New York — 224
    B. Nature of Appellate Review — 225
    C. Lack of Basis for Denial to Attorneys — 226

VI. Alternatives to New York Practice — 228

VII. Retroactivity — 228

VIII. Conclusion — 229

Appendix A. New York Judiciary Law § 90 — 230

Appendix B. New York Right to Appellate Review — 232

———————◆———————

WEINSTEIN, District Judge (dissenting).

Despite my high regard for New York's tradition in maintaining the high ethical standards of its bar, I reluctantly conclude that its disciplinary procedure is constitutionally infirm in denying attorneys the due process and equal protection guaranteed by the Fourteenth Amendment of the United States Constitution. There is no inconsistency between fair treatment of lawyers and maintenance of the long tradition of their discipline by the courts. There is no good reason why members of the legal profession, who have done so much to protect the constitutional rights of oth-

ers, should be deprived of justice with due process in hearings and appeals—rights available to all other professionals. As construed by New York courts, the statutory disciplinary procedure, Judiciary Law § 90, is invalid.

## I. NEW YORK DISCIPLINARY PROCEDURE

The procedure for disciplining attorneys is fairly uniform throughout the state. The statutory provision itself is set out as Appendix A to this opinion. The Appellate Division of the Supreme Court in each department receives complaints against individual attorneys from Bar Associations or the Departmental Judicial Inquiry on Professional Conduct, a body appointed and staffed by the Appellate Division.

In cases warranting action, the Appellate Division refers the charges to a referee. In the Second Department the referee is a Justice of the State Supreme Court; in other departments the referee may be an attorney. He hears the matter and reports his determinations on the facts, but he makes no findings, for he has no power to decide. In New York terminology, he is a referee to "hear and report," not to "hear and determine." The parties then make motions before the Appellate Division to affirm or disaffirm the referee's findings. They, according to testimony before us, submit briefs, but the Appellate Division does not take new evidence or hear oral argument. The usual practice, so far as this record shows, is to rule—whether in conformity with, or opposition to, the referee's findings—without giving any reasons for decision. Punishment may vary from censure to total disbarment with its concomitant loss of the right to practice law.

Following a suspension or disbarment order from the Appellate Division, attorneys involved in disciplinary proceedings are afforded an appeal as of right to the New York Court of Appeals only with respect to issues of law which the Court of Appeals finds directly involve the construction of the state or federal constitutions or apparently in a case in which an Appellate Division Justice dissents. *See* New York Constitution, Article 6, § 3; CPLR 5501 *et seq.*, 5601 *et seq.* Thus, in the ordinary case, an attorney convicted of professional misconduct by the Appellate Division cannot secure any appellate review of questions of law or fact. *Matter of Flannery*, 212 N.Y. 610, 611, 106 N.E. 630 (1914).

## II. FACTS

Three cases, each involving an attorney disciplined by the Appellate Division and denied the right to appeal that decision, have been consolidated in this proceeding.

## MILDNER

Plaintiff Herbert Mildner had been practicing for some thirteen years when Roberta Evans, his long time friend, alleged that he had wrongfully converted her funds for his personal use. The Second Department Judicial Inquiry on Professional Conduct conducted an investigation. Disciplinary proceedings were then commenced in 1972 by the Appellate Division which appointed Justice Albert McGrover, of the Supreme Court, as a referee to hear and report.

After extensive hearings, resulting in a record of more than 850 pages, Justice McGrover prepared a detailed report concluding that the charges set forth in the disciplinary proceeding petition had not been sustained. The referee based his conclusion on his evaluation of the credibility of the two main witnesses he had seen and heard. Their testimony was in substantial conflict. He credited the lawyer's version of what had occurred. Based solely on the record, the Appellate Division rejected the referee's report without stating any reasons for its disaffirmation. In a *per curiam* opinion it simply wrote: "In our opinion, contrary to the report, [the] . . . charges are fully sustained by the proof." *In Re Mildner*, 43 A.D.2d 350, 351, 352 N.Y.S.2d 13, 14 (2d Dept. 1974). "[C]onsidering the respondent's evident lack of candor and contrition," *id.*, the

court suspended plaintiff from the practice of law for three years.

Having obtained a stay of the order of suspension, Mr. Mildner applied to the Appellate Division for reargument or for permission to appeal to the New York Court of Appeals. That motion was denied without opinion.

The plaintiff then sought leave to appeal to the New York Court of Appeals. The application for leave to appeal was based upon three grounds: (1) that the plaintiff had been deprived of due process in that the order of suspension had been based on the recanted testimony of an admitted perjured witness; (2) that the Appellate Division had erred in reversing the findings of its referee; and (3) that as a matter of law the charges against the plaintiff had not been established. This motion was also denied without opinion. *In Re Mildner*, 34 N.Y.. 2d 516, 357 N.Y.S.2d 1025, 313 N.E.2d 796 (1974).

LEVIN

Plaintiff Milton Levin had an unblemished record since his admission to the New York bar over forty years ago. Disciplinary proceedings, formally instituted in 1972, stemmed from a 1970 Second Department inquiry conducted by Hon. Charles W. Froessel (Froessel inquiry), into the activities of former State Supreme Court Justice Michael M. D'Auria. During the Froessel inquiry, Levin had discussed with investigators certain transactions between D'Auria and his real estate partner, Maurice Gruber, had produced various documents, and had given testimony before the inquiry. The disciplinary petition charged that Levin had testified falsely when he stated that $30,000 in bonds transferred to D'Auria in 1967 was a loan, alleging that it was in reality part payment of a legal fee to D'Auria rendered in connection with a zoning application in Plainview, New York. With respect to Levin's production of documents, the petition charged that four admittedly back-dated documents—a deed, a blank acknowledgment of it, a promissory note, and one relating to a boat—were false and submitted deliberately to obstruct the inquiry.

On October 24, 1972, the Second Department appointed Morton B. Silberman, a Justice of the New York Supreme Court, as a referee to hear and report to it on these charges. Justice Silberman conducted ten days of hearings, embodied in over 1000 pages of transcript, during which he heard eleven witnesses and arguments of counsel. The written report of his findings completely exonerated Levin of all charges. Justice Silberman concluded, on the basis of a "thorough analysis of the evidence", that the charges were "supported by little more than conjecture and surmise." Report and Findings of Justice Morton Silberman, *In the Matter of Levin*, at 63 (August 31, 1973).

The Appellate Division, ignoring a request by Levin for oral argument, entered a summary decision, affirming Justice Silberman's report in all respects except as to that portion of the false document charge involving the boat document. As to that portion, the Second Department disaffirmed in one conclusory sentence:

"In our opinion, contrary to the report, the first charge, insofar as it relates to a document dated March 6, 1967 involving the transfer of a Chris Craft boat, was sustained by the evidence."

*In Re Levin*, 45 A.D.2d 455, 456, 359 N.Y.S.2d 77, 78 (2d Dept. 1974). On the basis of this partial disaffirmance, the Appellate Division ordered that Levin be suspended from the practice of law for three years.

Levin believed that the credibility of the parties and witnesses had been critical to a resolution of the charges against him. In fact, Referee Silberman had favorably noted Levin's demeanor, and the inconsistency in the testimony of the Froessel investigators. Report and Findings of Justice Morton Silberman, *In the Matter of Levin* at 63, 60–61. During the hearing he had also censured the prosecution's chief witness for suppress-

ing a document and attempting to justify his action. *In Re Levin,* Transcript of Proceedings before Justice Silberman at 1051 (January 18, 1973).

Levin then moved in the New York Court of Appeals for permission to appeal and for a stay of the suspension order pending determination of his motion. Levin also claimed that he was entitled to an appeal as of right on the constitutional questions raised by his case. The Court of Appeals denied, without opinion, Levin's motion for permission to appeal. 35 N.Y.2d 643, 362 N.Y.S.2d 1026, 321 N.E.2d 555 (1974). Nor did it grant Levin any appeal as of right.

GERZOF

Plaintiff Julius Gerzof was suspended from the practice of law for a period of three years by the 1974 order of the Appellate Division, Second Department. The charges against him also related to the Froessel investigation of Justice D'Auria. Gerzof was charged with soliciting and advising two other attorneys to reduce their legal fee on a zoning application so as to make available a sum of money to be used improperly to assure the granting of the application. He was also charged with falsely denying this act while a witness under oath at the Froessel inquiry. Justice Morton Silberman was designated to act as referee in the proceeding against Gerzof. In a 1973 report, the referee found the charges to be substantiated by the evidence. Gerzof made application to reopen the hearing for purposes of taking additional, newly discovered, testimony. This motion was denied by the Appellate Division which thereafter affirmed Referee Silberman's report without explanation. *In the Matter of Gerzof,* 45 A.D.2d 450, 359 N.Y.S.2d 76 (2d Dept. 1974).

Gerzof claimed that the evidence was legally and factually insufficient to sustain the charges against him and that the testimony had been permeated with substantive inconsistencies. He unsuccessfully sought an appeal as of right to the Court of Appeals, leave to appeal to the Court of Appeals from the Appellate Division, and leave to appeal from the Court of Appeals. 35 N.Y.2d 644, 362 N.Y.S.2d 1026, 321 N.E.2d 555 (1974).

Following commencement of the actions in this court seeking injunctive declaratory relief, the Appellate Division stayed commencement of plaintiffs' suspensions to permit this court to consider these cases.

## III. JURISDICTION

### A. Defendants are not Immune from Suit Under 42 U.S.C. § 1983.

Plaintiffs seek injunctive relief against the commission of acts in violation of their civil rights by state judges acting in their official capacity. Defendants argue that they are not subject to the jurisdiction of this court because the Appellate Division is not a "person" within the meaning of 42 U.S.C. § 1983, citing *Zuckerman v. Appellate Division,* 421 F.2d 625 (2d Cir. 1970).

First, *Zuckerman* has expressly been restricted by subsequent decisions to cases in which the Appellate Division is sued as a body. Where, as here, the Justices and Clerk of the Appellate Division are sued as individuals, *Zuckerman* does not apply and the federal court has jurisdiction over the defendants. *Erdmann v. Stevens,* 458 F.2d 1205, 1208 (2d Cir.), *cert. denied,* 409 U.S. 889, 93 S.Ct. 126, 34 L.Ed.2d 147 (1972) (and *see* Lumbard, J. concurring, 458 F.2d at 1214, n. 5); *Law Students Civil Rights Research Council v. Wadmond,* 299 F. Supp. 117, 123–24 (S.D.N.Y.1969) (three judge court), *aff'd on other grounds,* 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971).

Second, despite whatever immunity state judges may have from suits for money damages, *see Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), they enjoy no such immunity from suits, such as those brought here, for injunctive relief under Section 1983. In *Javits v. Stevens,* 382 F.Supp. 131 (S.D.N.Y.1974), a Section 1983 suit was brought against the Justices and Clerk

of the Appellate Division. Judge Mac-Mahon summed up the matter when he noted: .

> "[I]n this circuit, at least, state judges are not immune from suits for injunctive relief under § 1983, and since plaintiffs seek only injunctive and declaratory relief, we reject defendants' immunity argument."

*Id.* at 136. *See also, e. g., Littleton v. Berbling,* 468 F.2d 389, 395–409 (7th Cir. 1972), *rev'd on other grounds, sub nom. O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674, *vacated, Spomer v. Littleton,* 414 U.S. 514, 94 S. Ct. 685, 38 L.Ed.2d 694 (1974); *Wallace v. McDonald,* 369 F.Supp. 180, 188 (E. D.N.Y. 1973); *Law Students Civil Rights Research Council v. Wadmond,* 299 F.Supp. 117, 123 (S.D.N.Y. 1969) (three judge court), *aff'd on other grounds,* 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971).

B.  Plaintiffs' Actions Are Not Barred by Principles of Res Judicata, Collateral Estoppel, Waiver or Comity.

Plaintiffs, in attacking the constitutionality of the New York attorney disciplinary statute, raise issues not previously determined by the state courts. Defendants argue that plaintiffs are seeking to relitigate constitutional questions that were before the state court or that might have been raised. It is clear from the record that the constitutional questions before us were not raised before the referees or the Appellate Division in any of these cases. Motions made for leave to appeal to the Court of Appeals did not challenge the statute's constitutionality.

The principles of res judicata, collateral estoppel, or some special form of comity adverted to by a majority of the panel in *Tang v. Appellate Division,* 487 F.2d 138 (2d Cir. 1973), *cert. denied,* 416 U.S. 906, 94 S.Ct. 1611, 40 L.Ed.2d 111 (1974), have no application. In *Tang* the plaintiff-attorney sought a federal determination of precisely the same questions that were previously decided by the state court. After being denied admission to the New York bar for failure to meet the residence requirements, Mr. Tang commenced a state court action challenging the constitutionality of the requirements. *Id.* at 140–41 and 141 n. 2. When the Appellate Division decided against him Mr. Tang started a Section 1983 action in the federal court, raising the same issues he had posed in his unsuccessful state action. *Tang*—at least in the majority's opinion—rested on the familiar doctrine that a state court decision on a constitutional question voluntarily submitted is conclusive between the parties until modified by appeal. *See Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 417–419, 84 S.Ct. 461, 466, 11 L.Ed.2d 440 (1964); *Bricker v. Crane,* 468 F.2d 1228, 1231 (1st Cir. 1972), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1368, 35 L.Ed.2d 592 (1973).

The federal remedy under Section 1983 "is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." *Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961). *See also McNeese v. Board of Education,* 373 U.S. 668, 671–672, 83 S.Ct. 1433, 1435–36, 10 L.Ed.2d 622 (1963). *Cf.* Note, Res Judicata: Exclusive Federal Jurisdiction & The Effect of Prior State Court Determinations, 53 Va.L.Rev. 1360 (1967). Exhaustion is not required in Section 1983 cases. *See Wilwording v. Swenson,* 404 U.S. 249, 251, 92 S.Ct. 407, 409, 30 L.Ed. 2d 418 (1971) (per curiam); *Sugar v. Curtis Circulation Co.,* 377 F.Supp. 1055, 1059 (S.D.N.Y.1974). Nor is a bar raised by the fact that, theoretically, the constitutional questions these plaintiffs now present "might have been" litigated in the state proceedings. *Lombard v. Board of Education of City of New York,* 502 F.2d 631, 636 (2d Cir. 1974), *cert. denied,* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975). As the court stated in *Lombard:*

"To apply res judicata to a remedy which 'need not be first sought and refused' in the state court, and which actually was not sought would be to overrule the essence of *Monroe v. Pape* and *Lane v. Wilson*, 307 U.S. 268, 274, 59 S.Ct. 872, 83 L.Ed. 1281 (1939)."

*Id.* at 635. *See also Newman v. Board of Education of the City School Dist. of New York*, 508 F.2d 277 (2d Cir.), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1447, 43 L.Ed.2d 762 (1975).

In the *Lombard* case, a dismissed teacher unsuccessfully prosecuted *two* Article 78 proceedings in the state courts, during which he never specifically raised any constitutional issue. Thereafter, he instituted a Section 1983 action, claiming that he had been denied procedural due process in his dismissal as a teacher. The defendants argued that Mr. Lombard's constitutional claims were barred because he "should have raised them in [the] state proceedings". 502 F.2d at 635. The Second Circuit disagreed—expressly suggesting that no doctrine of waiver, or claim preclusion, should be applied to issues of procedural due process arising under Section 1983. 502 F.2d at 635–37.

Hence, to follow the defendants' argument in this case would be to flout governing case law and to emasculate the federal remedy provided by Section 1983. It would also deny these plaintiffs a hearing in any court on the substantial constitutional questions raised:

"Since under Section 1983 an individual seeks to preserve or vindicate federally guaranteed rights, a strong national interest in protecting those rights makes it incumbent upon the federal courts to avoid erecting barriers to prosecution of such suits in federal tribunals."

*Plano v. Baker*, 504 F.2d 595, 598 (2d Cir. 1974), quoting *Hayes v. Cape Henlopen School District*, 341 F.Supp. 823, 831 (D.Del. 1972).

The plaintiffs present before this court are not maneuvering to have this court review a state court disciplinary decision for its fairness. Their attack is on the constitutionality of the state statutory procedure for disciplining state attorneys. None of them has asked this federal court to review any judicial conduct or rulings in the state disciplinary proceedings against him, such as evidentiary rulings or rulings on questions of law. Nor have they challenged the tradition of court control of the bar. Rather, they have requested that the statutory procedure be declared unconstitutional. The attorneys' individual cases do, however, illustrate unconstitutional results which may be produced by an application of the statute.

## C. There is No Disruption of State Court Proceedings.

The defendants also suggest that this court lacks jurisdiction to interfere with state court proceedings and orders. The defendants, however, fail to distinguish between the procedural posture of this case and those in which the abstention doctrine has been applied.

Thus, in *Anonymous v. Association of the Bar*, 515 F.2d 427 (2d Cir. 1975), and in *Anonymous J. v. Bar Association*, 515 F.2d 435 (2d Cir. 1975), unlike here, the plaintiff attorneys sought to enjoin prosecution of pending state disciplinary proceedings through Section 1983 actions. The Second Circuit had rejected such an attempt, several years ago, in *Erdmann v. Stevens*, 458 F.2d 1205 (2d Cir.), *cert. denied*, 409 U.S. 889, 93 S.Ct. 126, 34 L.Ed.2d 147 (1972)—and simply did so again in the *Anonymous* cases, relying primarily on *Erdmann*.

The case before us is entirely different. Here there has been no attempt to enjoin prosecution of a pending state proceeding. The disciplinary proceedings against Mildner, Gerzof, and Levin, including the appellate process, had already been concluded prior to commencement of their federal actions.

*Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) is similarly inapposite. There, unlike

here, the Section 1983 plaintiff made no effort to appeal in the state courts before commencing its federal action. The Supreme Court ruled only that, in such circumstances, the abstention standards of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) must be met before the federal court may proceed:

> "We therefore hold that *Younger* standards must be met to justify federal intervention in a state judicial proceeding as to which a losing litigant has not exhausted his state appellate remedies. . . ."

*Huffman v. Pursue, Ltd., supra,* 420 U.S. at 609, 95 S.Ct. at 1211. In the cases consolidated here the plaintiffs had exhausted their state appellate remedies before commencing this action—lack of appellate review is, in fact, one of their chief complaints.

### D. State Court Supervision of Attorneys Is Subject to United States Constitution.

The defendants contend that since the state judiciary has control over the membership of its own bar, a federal court may not interfere with attorney disciplinary proceedings. As recently pointed out in *Javits v. Stevens,* 382 F.Supp. 131, 141 (S.D.N.Y.1974):

> "The intimate and delicate relationship between courts and lawyers has long justified the judiciary's careful scrutiny of the integrity and qualifications of those who practice before it."

*See also Theard v. United States,* 354 U.S. 278, 281, 77 S.Ct. 1274, 1276, 1 L.Ed.2d 1342 (1957); *Erdmann v. Stevens,* 458 F.2d 1205, 1208–09 (2d Cir.), *cert. denied,* 409 U.S. 899, 93 S.Ct. 126, 34 L.Ed.2d 147 (1972). But this argument confuses deference with abnegation of responsibility to enforce the Constitution. A brief incursion into the history of disciplinary proceedings may be useful in explaining how New York arrived where it is now. It will show that while New York's practice of leaving discipline to the courts accords with tradition, custom does not justify ignoring the constitutional rights of attorneys.

The New York courts do have broad power over attorneys practicing before them, inherited from the English practice followed in all American jurisdictions. As early as the thirteenth century, Parliament passed several statutes concerning rules and penalties relating to the practice of law. These were to be administered and enforced by the courts. H. Cohen, A History of the English Bar to 1450, 189–195 (1929).

As the bar grew, it developed into two main groups. One was the aristocratic, learned, well organized barristers who argued before the courts. During the fourteenth and fifteenth centuries the barristers began to organize in various Inns of Court, each of which prescribed methods and periods of required training for admission to the Inn and disciplined their own members. R. Pound, The Lawyer From Antiquity to Modern Times, 87–88 (1958). The judges retained a supervisory or reviewing power over the various Inns, especially with regard to disbarment. *See In Re Cannon,* 206 Wis. 374, 386–387, 240 N.W. 441, 446 (1932); Pound, *supra,* at 98–100.

Attorneys, the other branch, were usually drawn from the clerks of the court and were largely unorganized until the nineteenth century. *Id.* at 86. An attorney was admitted by the individual court in whose jurisdiction he was to practice and was directly disciplined by that court. *Id.* at 100; *In Re Cannon,* 206 Wis. 374, 386, 240 N.W. 441, 446 (1932). Although discipline was difficult to maintain, it was severe when it was effected. For example, the taking of a contingent fee was ground for disbarment and negligence in handling a case resulted in the lawyer being sent to prison. Cohen, A History of the English Bar to 1450, 234 (1929). Thus, the English courts supervised the largely self-disciplined barristers and directly disciplined attorneys.

This tradition of court supervision was followed in the colonies. The first recorded legislation concerning the practice of law was adopted in 1642–43 in Virginia. This statute provided that no attorney could plead a case without a license from the court. R. Pound, The Lawyer From Antiquity to Modern Times, 136–137 (1953). Early colonial statutes, like the English ones, were drafted in very broad terms, often accomplishing little more than acknowledging the courts' responsibility for supervision of attorneys. *Id.* at 135–42.

Following the Revolution, disciplinary proceedings were rare and occurred only in extreme cases. *Id.* at 185. Nevertheless, during the period from the Revolution to the Civil War, some disbarment cases reached the Supreme Court. In *Ex Parte Burr*, 22 U.S. (9 Wheat) 529, 531, 6 L.Ed. 152 (1824) the Court discussed a lower court's power to discipline lawyers:

> "The power is one which ought to be exercised with great caution, but which is, we think, incidental to all Courts, and is necessary for the preservation of decorum, and for the respectability of the profession."

The extent of the discretion of the disciplining court is more clearly enunciated in *Ex Parte Secombe*, 60 U.S. (19 How.) 9, 15 L.Ed. 565 (1856) where the Court discussed its own unreported 1829 decision in *Tillinghast v. Conkling*. In *Tillinghast*, a District Court had disbarred the petitioner and the Supreme Court held it had no jurisdiction, but it warned that the bar's right to its dignity and to a proper judicial proceeding before discipline was imposed could not be ignored.

> "[I]n a court of that character, the relations between the court and the attorneys and counsellors who practice in it, and their respective rights and duties, are regulated by the common law. And it has been well settled, by the rules and practice of common-law courts, that it rests exclusively with the court to determine who

is qualified to become one of its officers, as an attorney and counsellor, and for what cause he ought to be removed. *The power, however, is not an arbitrary and despotic one, to be exercised at the pleasure of the court,* or from passion, prejudice, or personal hostility; *but it is the duty of the court to exercise and regulate it by a sound and just judicial discretion, whereby the rights and independence of the bar may be scrupulously guarded and maintained* by the court, as the rights and dignity of the court itself." (Emphasis added.)

*Id.* at 13.

After the Civil War the court reaffirmed the authority of courts over attorneys as necessary to ensure the profession's integrity. *See, e. g., Randall v. Brigham*, 74 U.S. (7 Wall.) 523, 19 L.Ed. 285 (1868); *Ex Parte Garland*, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866). It recognized that state and federal courts have autonomous disciplinary authority over the conduct of the lawyers that practice before them. *See, e. g., In Re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117, *reh. denied*, 391 U.S. 961, 88 S.Ct. 1833, 20 L.Ed.2d 874 (1968); *Theard v. United States*, 354 U.S. 278, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957); *Ginger v. Circuit Court for City of Wayne*, 372 F.2d 621 (6th Cir.), *cert. denied*, 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 998 (1967); *Jones v. Hulse*, 391 F.2d 198 (8th Cir.), *cert. denied*, 393 U.S. 889, 89 S.Ct. 206, 21 L.Ed.2d 167 (1968). Normally, the federal courts will follow state disciplinary decisions since they rely upon the state's thoroughly developed admission and disciplinary apparatus. *Selling v. Radford*, 243 U.S. 46, 50–51, 37 S.Ct. 377, 378–379, 61 L.Ed. 585 (1917). *Cf. In Re Abrams*, 521 F.2d 1094 (3d Cir. 1975).

State legislatures have attempted to assume direct control over attorneys, including the passage of laws dictating individuals' admission to the bar. The courts have struck down such legislative interference. *See, e. g., In Re Splane*,

123 Pa. 527, 16 A. 481 (1889) (statute requiring that attorney admitted in one court be deemed admitted in all courts invalidated as beyond the power of the legislature to compel the courts to admit anyone as an attorney); *In re Cannon*, 206 Wis. 374, 240 N.W. 441 (1932) (statute ordering court to reinstate lawyer it had previously suspended held invalid as an infringement on the inherent powers of the court).

The assertiveness by the courts in this area combined with the growth of bar associations interested in professional ethics led to the development of more formalized procedures for discipline. In 1970 the American Bar Association published a major study of state disciplinary procedures. American Bar Association, Problems and Recommendations in Disciplinary Enforcement (1970) (Clark Report). The Clark report urged that only courts should regulate admission and disbarment and that any legislative interference was an unconstitutional invasion of the prerogatives of a coordinate branch of government. *Id.* at 10–18.

Section 90 of the New York Judiciary Law is in tune with these legal traditions, for it specifically states that such proceedings are the province of the courts. The statute has been construed as a reaffirmation and restatement of inherent judicial power. Thus, *In Re Anonymous*, 21 A.D.2d 48, 51, 248 N.Y.S.2d 368, 372 (1st Dept. 1964), an action to suspend an attorney on grounds of mental deficiency, noted:

> "The statute is 'declaratory of a jurisdiction that would have been implied.' The sense of the opinion by Chief Judge Cardozo in the *Karlin* case [*People ex rel. Karlin v. Culkin,* 248 N.Y. 465, 162 N.E. 487 (1928)] is that the Court has very broad inherent powers of supervision and that the statute is not restrictive but expressive of that power." (citations omitted.)

*See also Jones v. Hulse,* 391 F.2d 198 (8th Cir.), *cert. denied,* 393 U.S. 889, 89 S.Ct. 206, 21 L.Ed.2d 167 (1968).

Although the State of New York may properly delegate the enforcement of attorney discipline to the judiciary, it may not sidestep constitutional guarantees. As the Supreme Court stated in *Johnson v. Avery,* 393 U.S. 483, 490 n. 11, 89 S.Ct. 747, 751 n. 11, 21 L.Ed.2d 718 (1969):

> "The power of the States to control the practice of law cannot be exercised so as to abrogate federally protected rights."

*See also, Ex Parte Secombe,* 60 U.S. (19 How.) 9, 13, 15 L.Ed. 565 (1856); *In Re Fisher,* 179 F.2d 361, 369 (7th Cir. 1950), *cert. denied sub nom. Kerner v. Fisher,* 340 U.S. 825, 71 S.Ct. 59, 95 L. Ed. 606 (1950) ("The courts must not exercise their supervisory control in an arbitrary manner, but must show a legal discretion in the exercise thereof."); *Staud v. Stewart,* 366 F.Supp. 1398, 1401 (E.D.Pa.1973); *In Re Mackay,* 416 P.2d 823 (Alaska 1965), *cert. denied,* 384 U.S. 1003, 86 S.Ct. 1907, 16 L.Ed.2d 1016 (1966). *See also Spevack v. Klein,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967) (on certiorari from state court: discipline could not be predicated solely on the lawyer's exercise of his Fifth Amendment right to refuse to testify or produce records at a disciplinary hearing). *Cf. Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L. Ed.2d 796 (1957) (unconstitutional denial of admission); *Konigsberg v. State Bar of California,* 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810, *reh. denied,* 354 U.S. 927, 77 S.Ct. 1374, 1 L.Ed.2d 1441 (1957).

Hence the New York statute, codifying judicial power to discipline attorneys, is not immune from attack. Plaintiffs in the instant case have sued the defendants as the state officers charged with administering and enforcing the challenged statute; they are seeking an injunction restraining the defendants from enforcing that statute. This was precisely the relief sought against the same defendants with respect to the state statute in *Law Students Civil Rights Research Council v.*

*Wadmond,* 299 F.Supp. 117 (S.D.N.Y. 1969) (three-judge court), *aff'd on other grounds,* 401 U.S. 154, 91 S.Ct. 720, 27 L. Ed.2d 749 (1971). There the court found that the Appellate Division judges could be enjoined from enforcing an unconstitutional state statute dealing with the bar. Any citizen, including a disciplined attorney, who is allegedly deprived of rights protected by the Constitution, can seek review in a federal court. As the court stated in *Law Students, supra,* 299 F.Supp. at 123:

> "We fail to perceive what interest would be served by holding federal courts to be powerless to enjoin state officers from acting under a statute that allegedly deprives citizens of rights protected by the Civil Rights Act or promulgating regulations that are alleged to have that result simply because some of them are robed and others have been appointed by those who are."

Disciplinary proceedings may be particularly susceptible to abuse because of their summary character. Lyman, State Bar Discipline & The Activist Lawyer, 8 Harv.Civ.Rights—Civ.Lib.L.Rev. 235 (1973). "Only by providing that the social enforcement mechanism must function strictly within [Constitutional] bounds can we hope to maintain an ordered society that is also just." *Boddie v. Connecticut,* 401 U.S. 371, 375, 91 S.Ct. 780, 784, 28 L.Ed.2d 113 (1971).

## IV. DUE PROCESS

### A. *The Right Generally*

When an individual is faced with a criminal prosecution, strict adherence to the full panoply of due process protections is guaranteed. U.S.Const.Amends. V, XIV. In other situations, the importance of the right as well as the need of the state for summary procedures to carry out particular public policies have been balanced in determining which procedural protections must apply. *See,* e. g., *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (suspension of students); *Morrissey v. Brewer,* 408

U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) (revocation of parole); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (suspension of driver's license); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L. Ed.2d 287 (1970) (termination of relief payment); *Willner v. Committee on Character and Fitness,* 373 U.S. 96, 102, 83 S.Ct. 1175, 1179–1180, 10 L.Ed.2d 224 (1963) (exclusion from bar); *Joint Anti-Fascist Comm. v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (listing of "subversive" organizations). Here we must determine which protections are required when the suspension or disbarment of an attorney is at stake and whether limited procedural protections are permitted because of the nature of the lawyer's relationship to the court.

Because due process calls for such procedural protections as the particular situation demands,

> "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action."

*Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748–49, 6 L.Ed.2d 1230, *reh. denied,* 368 U.S. 869, 82 S.Ct. 22, 7 L.Ed. 2d 70 (1961).

A determination of suspension or disbarment, capable of destroying an attorney's reputation and livelihood, can be a devastating sanction. For this reason the Supreme Court has characterized disbarment proceedings as being "of a quasi-criminal nature". *In Re Ruffalo,* 390 U.S. 544, 551, 88 S.Ct. 1222, 1226, 20 L.Ed.2d 117, *reh. denied,* 391 U.S. 961, 88 S.Ct. 1833, 20 L.Ed.2d 874 (1968). As the Second Circuit stated in *Erdmann v. Stevens,* 458 F.2d 1205, 1209–10 (2d Cir.), *cert. denied,* 409 U.S. 889, 93 S.Ct. 126, 34 L.Ed.2d 147 (1972):

> "[I]n our view *a court's disciplinary proceeding against a member of its bar*

*is comparable to a criminal rather than a civil proceeding. . . .* [I]t cannot be disputed that for most attorneys the license to practice law represents their livelihood, loss of which may be a greater punishment than a monetary fine. See *Bradley v. Fisher,* 80 U.S. [13 Wall.] 335, 355, 20 L.Ed. 646 (1872); *Spevack v. Klein,* 385 U.S. 511, 516, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). Furthermore, disciplinary measures against an attorney, while posing a threat of incarceration only in cases of contempt, may threaten another serious punishment—loss of professional reputation. The stigma of such a loss can harm the lawyer in his community and in his client relations as well as adversely affect his ability to carry out his professional functions . . . ." (Emphasis supplied.)

No one, including the plaintiffs, denies that the state has an interest in orderly procedures for adjudicating attorney disciplinary proceedings. It has a responsibility " 'to determine the fitness of an officer of the court to continue in that capacity and to protect the courts and the public from the official ministration of persons unfit to practice.'" *In Re Ming,* 469 F.2d 1352, 1353 (7th Cir. 1972) (citations omitted). *See also, Baird v. State Bar of Arizona,* 401 U.S. 1, 7, 91 S.Ct. 702, 706, 27 L.Ed.2d 639 (1971); *Theard v. United States,* 354 U.S. 278, 281, 77 S.Ct. 1274, 1276, 1 L.Ed.2d 1342 (1957); *Ex Parte Wall,* 107 U.S. 265, 2 S.Ct. 569, 27 L.Ed. 552 (1882). The legal profession is "imbued with public trust." *In Re Echeles,* 430 F.2d 347, 350 (7th Cir. 1970). We hardly need to be reminded by the events surrounding the Watergate tragedy that much of the effectiveness of our democratic, constitutional system of government depends upon the honor and integrity of members of the bar. Particularly in the relationship of the courts to the bar, "the interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice." *Goldfarb v. Virginia State Bar,*

421 U.S. 773, 95 S.Ct. 2004, 2016, 44 L. Ed.2d 572 (1975).

If the bar is unfit and does not properly protect the rights of the public, the entire judicial system may be brought into disrepute:

"It is not enough that the doors of the temple of justice are open; it is essential that the ways of approach be kept clean."

*Hatfield v. King,* 184 U.S. 162, 168, 22 S.Ct. 477, 479, 46 L.Ed. 481 (1902). *See also, Booth v. Fletcher,* 69 U.S.App.D.C. 351, 101 F.2d 676 (1938), *cert. denied,* 307 U.S. 628, 59 S.Ct. 835, 83 L.Ed. 1511 (1939).

But, as already noted, New York's obligation to provide effective discipline must be weighed against the significant individual rights at stake. Due process requires that the procedures used in legal proceedings be appropriate to the case and just to the parties affected. As Justice Goldberg commented:

"Certainly lawyers and courts should be particularly sensitive of, and have a special obligation to respect, the demands of due process."

*Willner v. Committee on Character & Fitness,* 373 U.S. 96, 106, 83 S.Ct. 1175, 1182, 10 L.Ed.2d 224 (1963) (discussing bar admission procedures in the State of New York). "[W]hen a State seeks to . . . disbar a lawyer, it must proceed according to the most exacting demands of due process of law." *Law Students Civil Rights Research Council, Inc. v. Wadmond,* 401 U.S. 154, 174, 91 S.Ct. 720, 731, 27 L.Ed.2d 749 (1971) (Black and Douglas, JJ., dissenting). "[I]ts members. . . . should not be disciplined . . . without full and unquestioned due process of law and protection of all their constitutional rights." *Id.* at 185, 91 S.Ct. at 737.

Writing in a case where an attorney was accused of the heinous crime of participating in a lynching in front of a courthouse, Justice Field in *Ex Parte Wall,* 107 U.S. 265, 303, 2 S.Ct. 569, 601,

27 L.Ed. 552 (1883) (dissenting), reminded us:

"The power to disbar attorneys in proper cases . . . is not to be exercised arbitrarily or tyrannically. Under our institutions arbitrary power over another's lawful pursuits is not vested in any man nor in any tribunal. It is odious wherever exhibited, and nowhere does it appear more so than when exercised by a judicial officer towards a member of the bar practicing before him."

We turn to some of the incidents of due process claimed to be denied attorneys by the procedure used by the state in disciplining members of the bar.

### B. *Meaningful Hearing by Trier of Fact*

#### 1. *Requirement of Opportunity to be Heard*

"The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). Particularly when a person's good name, integrity, reputation or honor is at stake because of government action, a full and fair hearing should include, at the very least, notice of the charges or complaint, disclosure of the evidence supporting the charges, and an opportunity to be heard and to confront and cross-examine witnesses. *See, e. g., Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972); *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed. 2d 515 (1971); *Willner v. Comm. on Character & Fitness*, 373 U.S. 96, 103, 83 S.Ct. 1175, 1180, 10 L.Ed.2d 224 (1963); *Greene v. McElroy*, 360 U.S. 474, 492, 496–97, 79 S.Ct. 1400, 1411, 1413, 3 L.Ed.2d 1377 (1959).

It follows that in attorney disciplinary proceedings, due process requires a reasonable opportunity to present a defense to the trier. *See, e. g., In Re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117, *reh. denied*, 391 U.S. 961, 88 S.Ct. 1833, 20 L.Ed.2d 874 (1967); *Kivitz v. SEC*, 154 U.S.App.D.C. 372, 475 F.2d 956 (1973); *In Re Los Angeles County Pioneer Society*, 217 F.2d 190 (9th Cir. 1954). The hearing "must be granted . . . in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965).

#### a. Evaluating Credibility of Witnesses

When the credibility of witnesses is involved, a meaningful hearing should include their appearance before the trier-of-fact so that it can observe their demeanor. As Judge Learned Hand wrote in *Dyer v. MacDougall*, 201 F.2d 265, 268–69 (2d Cir. 1952):

"It is true that the carriage, behavior, bearing, manner and appearance of a witness—in short, his 'demeanor'—is a part of the evidence. The words used are by no means all that we rely on in making up our minds about the truth of a question that arises in our ordinary affairs, and it is abundantly settled that a jury is as little confined to them as we are. They may, and indeed they should, take into consideration the whole nexus of sense impressions which they get from a witness. This we have again and again declared, and have rested our affirmance of findings of fact of a judge, or of a jury, on the hypothesis that this part of the evidence may have turned the scale. Moreover, such evidence may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies."

The cases emphasizing the importance of demeanor as an aid to the determination of credibility are "numerous and well known." *United States ex rel. Graham v. Mancusi*, 457 F.2d 463, 469

(2d Cir. 1972). *See also, Emslie v. State Bar of California,* 11 Cal.3d 210, 113 Cal.Rptr. 175, 520 P.2d 991, 995–96 (1974). *Cf. Barber v. Page,* 390 U.S. 719, 725–26, 88 S.Ct. 1318, 1322, 20 L. Ed.2d 255 (1968); *Berger v. California,* 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969). In criminal and quasi-criminal cases, "The one who decides must hear." *Morgan v. United States,* 298 U.S. 468, 481, 56 S.Ct. 906, 912, 80 L.Ed. 1288 (1936). *See also, Lacomastic Corp. v. Parker,* 54 F.Supp. 138, 141 (D.Md. 1944) ("in judicial as distinguished from administrative proceedings, there is an inherent right on the part of litigants to have a decision rendered by the judge who presides at the trial and hears the testimony.").

Reliance of those making factual determinations on the demeanor of witnesses in assessing the truthfulness of their testimony is one of the reasons appellate courts are limited in their scope of review. In federal non-jury cases Rule 52(a) of the Federal Rules of Civil Procedure provides that findings of fact shall not be set aside by an appellate court unless "clearly erroneous." *See United States v. United States Gypsum Co.,* 333 U.S. 364, 394–95, 68 S.Ct. 525, 541–542, 92 L.Ed. 746 (1948). The appellate court may examine all the evidence in the record, but due regard must be given to the opportunity of the trial judge to judge the credibility of the witnesses. *See, e. g., Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 336 U.S. 271, 275, 69 S.Ct. 535, 537–38, 93 L.Ed. 672 (1949), *rev'd in part,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Aunt Mid., Inc. v. Fjell-Oranje Lines,* 458 F.2d 712, 716 (7th Cir.), *cert denied,* 409 U.S. 877, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972).

Although the Appellate Division's scope of review is somewhat broader (N.Y.C.P.L.R. 5501(c)), New York practice recognizes that the trial judge is in the best position to evaluate evidence. He who "has seen and heard the witnesses and has opportunity to question them . . . has often an ad-

vantage over the Appellate judge who must reach his conclusion upon the written record alone." *People ex rel. MacCracken v. Miller,* 291 N.Y. 55, 61, 50 N.E.2d 542, 544 (1943).

Precedents where the trier did not hear the witnesses absent the parties consent involve pure civil and administrative adjudications. *See, e. g., De La Rama v. De La Rama,* 241 U.S. 154, 36 S.Ct. 518, 60 L.Ed. 932 (1915) (matrimonial; consent of parties); *United States v. Vater,* 259 F.2d 667 (2d Cir. 1958) (condemnation; consent by parties implied from failure to object); *Utica Mutual Insurance Co. v. Vincent,* 375 F.2d 129, 131–32 (2d Cir.), *cert. denied,* 389 U.S. 839, 88 S.Ct. 63, 19 L. Ed.2d 102 (1967) (N.L.R.B. decision); *Lacomastic Corp. v. Parker,* 54 F.Supp. 138 (D.Md.1944); *S. J. Charia & Co. v. United States,* 248 F.2d 124 (Cust. Ct.1956) (chief witness heard by deciding court).

> "The trial judge has the right and duty to observe the bearing and demeanor of the witnesses, and where the evidence is conflicting, he may take these things into account. Such personal observations cannot be transferred to the printed page, and yet the judge may, and often must, give them weight in making his decision. In the present instance it is difficult to see how the judge who entered the findings had any proper opportunity to decide any question affected by the credibility of the witnesses."

*United States v. Nugent,* 100 F.2d 215, 217 (6th Cir. 1938), *cert. denied sub nom. Fidelity & Columbia Trust Co. v. United States,* 306 U.S. 648, 59 S.Ct. 591, 83 L.Ed. 1046 (1939). *See also, Smith v. Dental Products,* 168 F.2d 516, 519 (7th Cir. 1948).

### b. Right to Argue to Trier

The importance of oral argument before the fact finding court to assist it in drawing inferences and evaluating probative force of the evidence cannot be underestimated. It is an essential part of the trial which may not be denied

to a litigant. The Supreme Court has just re-emphasized this point in declaring unconstitutional a New York practice permitting the court to deny counsel the opportunity to make a summation at the end of a criminal case tried without a jury. *Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975).

"There can be doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial. . . . [T]he overwhelming weight of authority, in both federal and state courts, holds that a total denial of the opportunity for final argument in a nonjury criminal trial is a denial of the basic right of the accused to make his defense. . . . [T]here can be no justification for a statute that empowers a trial judge to deny absolutely the opportunity for any closing summation at all. . . . In denying the appellant this right under the authority of its statute, New York denied him the assistance of counsel that the Constitution guarantees." (Footnotes omitted.)

*Id.* at 857, 859, 862, and 863, 95 S.Ct. at 2553, 2554, 2555, and 2556. *See, e. g., United States v. Walls,* 443 F.2d 1220, 1223 (6th Cir. 1971) ("Preclusion of closing arugment denied appellant the effective assistance of counsel"); *United States v. Sawyer,* 143 U.S.App. D.C. 297, 443 F.2d 712, 713 n. 5 (1971) ("The defendant's right to present argument is part of his Sixth Amendment right to counsel . . .); *United States ex rel. Wilcox v. Commonwealth of Pennsylvania,* 273 F.Supp. 923, 924 (E.D.Pa. 1967) (right to have counsel present legitimate argument to the fact finder is recognized as an essential ingredient of due process); *Williams v. Brooklyn Elevated R.R. Co.,* 126 N.Y. 96, 102–103, 26 N.E. 1048 (1891) (counsel should not be prevented from exercising within the four corners of the evidence the widest latitude by way of comment, denunciation or appeal in advocating his cause); *Lyman v. Fi-*

*delity & Casualty Co.,* 65 App.Div. 27, 28, 72 N.Y.S. 498 (1st Dept. 1901) (court may not deprive party of the right and privilege of presenting through its counsel its own views of the conflicting evidence and questions upon which the fact finder is to pass); *People v. Marcelin,* 23 A.D.2d 368, 369–70, 260 N.Y.S.2d 560, 561–62 (1st Dept. 1965) (the proper argument of the cause is as much a part of the trial as the hearing of evidence); Maguire, et al., Cases and Materials on Evidence, 1006–1007 (6th ed. 1973); Annot., Prejudicial Effect of Trial Court's Denial, or Equivalent, of Counsel's Right to Argue Case, 38 A.L.R. 2d 1396 (1954). Even under the continental nonadversarial system, where the judge and not counsel interrogates the witnesses, oral argument by counsel is considered vital. *See* Damaska, Presentation of Evidence and Factfinding Precision, 123 U. of Pa.L.Rev. 1083, 1090 (1975). *See also id.* at 1100.

The denial of oral argument by the nisi prius court is a denial of the right to counsel under the Sixth Amendment of the United States Constitution. Since the Sixth Amendment is incorporated into the Fourteenth Amendment's right to due process, the New York attorney disciplinary practice constitutes a denial of due process. *See, e. g., Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); *Klopfer v. North Carolina,* 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967).

At the appeals level, limiting argument may, in some cases, be justified. *See Federal Communications Com'n. v. WJR, The Goodwill Station,* 337 U.S. 265, 276, 69 S.Ct. 1097, 1103–04, 93 L.Ed. 1353 (1949). But for the proceedings to be just at the trial level, where the issues and facts, including the credibility of witnesses, must be explored fully, an opportunity for oral presentation by counsel is essential. *See Londoner v. Denver,* 210 U.S. 373, 386, 28 S.Ct. 708, 714, 52 L.Ed. 1103 (1908); K. Llewellyn, The Common Law Tradition: Deciding Appeals 240 (1960); Note, Screening of Criminal Cases in the Federal Courts

of Appeals: Practice and Proposals, 73 Colum.L.Rev. 77, 84 (1973).

Even at the appellate level, judges and attorneys have expressed the view that oral argument, providing the opportunity for an exchange between court and counsel, often significantly affects the decision. Commission on Revision of the Federal Court Appellate System, Structure and Internal Procedures: Recommendations for Change 66 (1975). An impressive ninety per cent of the attorneys questioned in an extensive survey of attorney attitudes in three circuits agreed that:

> "judges are better able to avoid erroneous interpretations of the facts or issues in the case if they can direct questions to counsel, and that oral argument permits the attorney to address himself to those issues which the judges believe are crucial to the case."

*Id.* at 67. In response to this data and other testimony, the Commission on Revision of the Federal Court Appellate System recommended that Congress establish a minimum national standard, applicable to each of the courts of appeals, providing that the opportunity for oral argument should be viewed as the norm. *Id.* at 68.

c. Statement of Reasons for Decision

Minimal due process requires that a decision maker confine itself to the record, to the legal evidence adduced at the hearing, to the applicable rules of law, and to a sound exercise of discretion. Without any written statement from the decision maker, there is no assurance that these requirements are met.

Such an explanation is an important function of any judicial opinion. Professor Llewellyn's observation is particularly apt:

> "Plainly . . . [letting counsel feel that the case has been dealt with carefully and fairly] is one function and no slight one; but surely at our present juncture an equally, a more important office is *to let the winner* (and incidentally *the loser,* and not at all incidentally, *any member of the bar*) get

*some working idea of what did the scoring for the victory."* (Emphasis in original.)

K. Llewellyn, The Common Law Tradition: Deciding Appeals 290 (1960).

### Court of Original Jurisdiction

While not constitutionallly applicable to the states, Rule 52(a) of the Federal Rules of Civil Procedure is typical of American practice. It requires findings of fact and conclusions of law to be made in all civil actions tried upon the facts without a jury. The object is to promote care on the part of trial judges in ascertaining the facts to aid in their process of adjudication, to permit application of res judicata and estoppel of judgment, and to guide the appellate court on review. *See, e. g.,* Advisory Committee Note to Rule 52(a) (1946); *United States v. Forness,* 125 F.2d 928, 942 (2d Cir.), *cert. denied sub nom. City of Salamanca v. United States,* 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942). The trial court's findings must "afford a clear understanding of the ground upon which the court based its judgment." *Fluor Corp. v. United States ex rel. Mosher Steel Co.,* 405 F.2d 823, 828 (9th Cir.), *cert. denied,* 394 U.S. 1014, 89 S.Ct. 1632, 23 L.Ed.2d 40 (1969). *See also, e. g., Lemelson v. Kellogg Co.,* 440 F.2d 986, 988 (2d Cir. 1971); *Berguido v. Eastern Air Lines, Inc.,* 369 F.2d 874, 877 (3d Cir. 1966), *cert. denied,* 390 U.S. 996, 88 S.Ct. 1194, 20 L.Ed.2d 95 (1968). As the court observed in *Russo v. Central School District No. 1,* 469 F.2d 623, 628 (2d Cir. 1972), *cert. denied,* 411 U.S. 932, 93 S.Ct. 1899, 36 L. Ed.2d 391 (1973):

> "Findings that are nothing but cold rhetoric, couched in extraordinarily broad and general terms, and stripped of underlying analysis or justification or an accompanying memorandum or opinion shedding some light on the reasoning employed, invite closer scrutiny, especially when the case concerns fundamental constitutional freedoms."

*See also, Schneiderman v. United States,* 320 U.S. 118, 129–131, 63 S.Ct. 1333, 1338–39, 87 L.Ed. 1796 (1943).

In criminal cases, when a case is tried to the court, Rule 23(c) of the Federal Rules of Criminal Procedure provides that a defendant may request findings of fact. They "aid the defendant in presenting questions for appeal and aid the appellate court in delineating the factual bases on which the trial court's decision rested." *United States v. Livingston,* 459 F.2d 797, 798 (3d Cir. 1972). *See also, United States v. Johnson,* 496 F.2d 1131, 1138 (5th Cir. 1974), *cert. denied,* 420 U.S. 972, 95 S.Ct. 1391, 43 L.Ed.2d 651 (1975). The rationale for the criminal and civil rules is similar; both require the trial court to analyze the case and articulate the grounds on which it based its judgment. All judges are aware that this process sometimes convinces us that our original, tentative, conclusion was unwarranted.

### ■ *Administrative Determinations*

Courts reviewing administrative determinations are acutely aware of the potential for abuse and the need to insure fairness and facilitate judicial review by requiring statements of fact. In *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the Supreme Court required a state to afford a welfare recipient minimal due process before terminating his welfare benefits. The court held that minimal due process included a statement of reasons for decision:

"Finally the decisionmaker's conclusion as to a recipient's eligibility must rest solely on the legal rules and evidence adduced at the hearing. . . . To demonstrate compliance with this elementary requirement, *the decision maker should state the reasons for his determination and indicate the evidence he relied on,* . . . though his statement need not amount to a full opinion or even formal findings of fact and conclusions of law." (Emphasis supplied.)

*Id.* at 271, 90 S.Ct. at 1022.

More recently, the Court, in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), ruled that a parolee has a right to a hearing before revocation of parole. The hearing should take place in two stages: a preliminary hearing to determine whether there is probable cause to believe a parole violation has been committed, and a formal revocation hearing to finally adjudicate the charge. The court required a written statement of the reasons for the action taken at each stage of the hearing:

"Our task is limited to deciding *the minimum requirements of due process. They include* . . . *a written statement by the factfinders as to the evidence relied on* and reasons for revoking parole." (Emphasis supplied.)

*Id.* at 488–89, 92 S.Ct. 2604. *See also, id.* at 487, 92 S.Ct. at 2603; *United States ex rel. Johnson v. Chairman, N.Y. State Board of Parole,* 363 F.Supp. 416, 419 (E.D.N.Y. 1973), *aff'd* 500 F.2d 925 (2d Cir. 1974) (right to written opinion when parole denied); *Miller v. Iowa State ASCS Comm.,* 374 F.Supp. 415, 421 (S.D.Iowa 1974) (reasons for involuntary termination of employment).

The New York courts have recognized the importance of stating reasons for decisions by administrative boards. In *Solari v. Vincent,* 46 A.D.2d 453, 363 N.Y.S.2d 332, (2d Dept. 1975), the Appellate Division followed Morrissey's ruling that effective judicial review of a parole release determination could not be had without a statement of reasons. In reviewing the Board of Regents' determination suspending a chiropractor's license, the court in *Gold v. Nyquist,* 43 A.D.2d 617, 349 N.Y.S.2d 165 (3d Dept. 1973), found it was unable to fairly evaluate the board's determination since no findings of fact had been made. Accordingly, it remitted the matter for findings of fact.

Particularly when administrative action "touches on fundamental personal interests in life, health, and liberty,"

*Environmental Defense Fund v. Ruckels-haus,* 142 U.S.App.D.C. 74, 439 F.2d 584, 598 (1971), courts have sought to protect those interests from administrative arbitrariness by requiring administrators to support their decisions by findings of fact and reasoned opinions. *See, e. g., id.* at 597.

Decision by fiat is repugnant to due process whether the decision is rendered by an administrative or judicial tribunal. As Judge Jerome Frank wrote in *United States v. Forness,* 125 F.2d 928, 942 (2d Cir.), *cert. denied sub nom. City of Salamanca v. United States,* 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942):

> "The judiciary properly holds administrative officers to high standards in the discharge of the fact-finding function. The judiciary should at least measure up to the same standards."

Any person substantially hurt by a decision should be given the opportunity to know what is in the trier's mind. Those punished deserve to know why. *See* Leflar, Some Observations Concerning Judicial Opinions, 61 Colum.L.Rev. 810 (1961).

■ Appellate Review

Traditionally, appellate courts, in well reasoned and thoughtful opinions, have apprised litigants of the court's reasons for decisions in their case and by dint of painstaking justifications, contributed to the development of the law. Reliance on this "reasonability" and "regularity" produces a viable appellate system. *See* K. Llewellyn, The Common Law Tradition: Deciding Appeals, 183, 195 (1960). Abandonment of this practice to adjust to demands of efficiency undercuts both public confidence and constitutional values.

Within the last decade the number of appellate cases in the federal courts has tripled. Cramton, Federal Appellate Justice in 1973, 59 Cornell L.Rev. 571 (1974). *See also,* Rosenberg, Planned Flexibility to Meet Changing Needs of the Federal Appellate System, 59 Cornell L.Rev. 576, 579 (1974). The busiest appeals court in the country is the Appellate Division of the State Supreme Court sitting in Brooklyn. "Last year it disposed of 3,190 appeals, an increase of 14.3 per cent over its 1973 total." 'Realistic' Justice, N.Y. Times, March 30, 1975, at 31, col. 1. *See also,* Hopkins, The Role of an Intermediate Appellate Court, 41 Brooklyn L.Rev. 459 (1975).

Concern over the increased workload of the appellate courts and the resulting delay has contributed to the development of new techniques for handling cases. *See* Commission on Revision of the Federal Court Appellate System, Structure and Internal Procedures: Recommendations for Change, 54–55 (1975). Note, Screening of Criminal Cases in the Federal Courts of Appeals: Practice and Proposals, 73 Colum.L.Rev. 77 and n. 1 at 77 (1973); 'Realistic' Justice, N.Y. Times, March 30, 1975, at 31, col. 1.

One of the areas affected is the writing and publishing of judicial opinions. For example, the Committee on Use of Appellate Court Energies of the Advisory Council for Appellate Justice has proposed that "principles and procedures should be adopted that will reduce the publication of appellate opinions that are without general significance to the public, to the legal profession, or to advancing the functions of the law." Standards for Publication of Judicial Opinions, FJC Reasearch Series No. 73–2 at 5 (August 1973).

It is, therefore, not surprising that over half the circuit courts have formulated local rules under which many cases are decided without opinion. Commission on Revision of the Federal Court Appellate System: Opinion Writing and Publication at 2 (1974). Cases decided in this manner are listed in the back of the Federal Reporter. *See, e. g.,* 503 F.2d 1396–1405 (1974). There is a great variety of procedures used to announce the result, with or without some articulation of the reasoning of the court, all of which are categorized as cases decided without opinion. Rule 21 in the Fifth Circuit provides that an opinion is not appropriate

"[w]hen the court determines that any one or more of the following circumstances exists and is dispositive of a matter submitted to the court for decision: (1) that a judgment of the district court is based on findings of fact which are not clearly erroneous; (2) that the evidence in support of a jury verdict is not insufficient; (3) that the order of an administrative agency is supported by substantial evidence on the record as a whole; (4) that no error of law appears; and the court also determines that an opinion would have no precedential value . . . ."

Many such opinions contain no mention of the issues or authorities analyzed; they merely state "Affirmed" or "Enforced." *See, e. g., Henderson v. United States Public Health Service,* 502 F.2d 1165 (5th Cir. 1974); *N.L.R.B. v. Union de Tronquistas,* 503 F.2d 1396 (1st Cir. 1974). *See* for an explanation of the rule, *N.L.R.B. v. Amalgamated Cloth. Wkrs. of Amer., AFL–CIO, Local 990,* 430 F.2d 966 (5th Cir. 1970).

In the Second Circuit, when the panel is unanimous in its decision to affirm and in its determination that no advantage would be achieved by the publication of an opinion, the decision is announced from the bench or by summary order. Rules of U.S.Ct.App. for the 2d Cir., Rule § 0.23. This oral decision may include a brief statement of the court's reasoning.

Other procedures include a memorandum prepared specifically for the litigants, Rules of the United States Court of Appeals for the 9th Circuit, Rule 21; judgment orders in the Third Circuit, (Testimony of Chief Judge Seitz before the Commission on Revision of the Federal Court Appellate System at 39, Washington, D.C. Aug. 2, 1973), and orders which closely resemble opinions. Rules of the United States Court of Appeals for the 7th Circuit, Rule 28. Rules cited in Commission on Revision of the Federal Court Appellate System, Opinion Writing and Publication, at 4 (1974).

*See* Haworth, Screening & Summary Procedures in the United States Courts of Appeals, 1973 Wash.Univ.L.Q. 257, 271 and n. 85–89 for an analysis of the existing rules.

It is significant that none of the Rules analyzed by Haworth permits reversals without opinion. All seem to agree that the losing litigant is entitled to know why he lost. Since the trial court must give reasons in bench trials, it can be assumed that an affirmance without opinion found the reasoning below satisfactory.

Undoubtedly courts must deal effectively with the "flood tide" of appeals. *See Taylor v. McKeithen,* 407 U.S. 191, 196, 92 S.Ct. 1980, 1983, 32 L.Ed.2d 648 (1972) (Rehnquist, J., dissenting). But efficient procedures may not always be just. "[T]he Constitution recognizes higher values than speed and efficiency." *Stanley v. Illinois,* 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972).

Moreover, part of the task of judicial opinions is to insure the acceptance of the system of law in the society it governs. *See* Leflar, Some Observations Concerning Judicial Opinions, 61 Colum. L.Rev. 810, 812 (1961). From a narrower standpoint it is particularly desirable that the expectations of the legal community be realized. For "when your rooters stop rooting, your constituents lose ardor, and even the general public begin to mutter," a crisis of confidence may develop. K. Llewellyn, The Common Law Tradition: Deciding Appeals 198 (1960).

At the request of the Commission on Revision of the Federal Court Appellate System, the Bureau of Social Science Research conducted a survey of a randomly selected group of attorneys, experienced in federal appellate court procedures, in the Second, Fifth and Sixth Circuits. They were asked questions designed to indicate their background, measure their feelings about the desirability of certain types of abbreviated procedures and their preferences when a "trade-off" was required between var-

ious procedures. Commission on Revision of the Federal Court Appellate System, Opinion Writing & Publication at 7 (1974). The attorneys made it clear that they considered it significant for the court to provide some rationale for the result:

"The most dramatic evidence of the importance which attorneys attach to a written record of the reason for a decision can be found in the view expressed by more than two-thirds of the attorneys surveyed that the due process clause of the Constitution should be held to require courts of appeals to write at least a brief statement of the reasons for their decisions."

Commission for Revision of the Federal Court Appellate System, Structure & Internal Procedures: Recommendations for Change 69 (1975). If this survey is indicative of attorneys' values, there is a great risk that confidence in the judicial system may be affected by unexplained decisions.

Unquestionably the use of affirmances without opinions "is certainly not to be encouraged in other than clearly deserving cases." Haworth, Screening & Summary Procedures in the United States Courts of Appeals, 1973 Wash.Univ.L.Q. 257, 272. As the Court of Appeals for the Fifth Circuit put it in *N.L.R.B. v. Amalgamated Cloth. Wkrs. of Amer. AFL–CIO, Local 990*, 430 F.2d 966, 972 (5th Cir. 1970):

"A most important function is the writing of opinions. Opinions are to serve a number of purposes at least two of which are highly significant. One is that an articulated discussion of the factors, legal, factual or both, which lead the Court to one rather than to another result, gives strength to the system, and reduces, if not eliminates, the easy temptation or tendency to ill-considered or even arbitrary action by those having the awesome power of almost final review. The second, of course, is that the very discursive statement of these articulated reasons is the thing out of which

law—and particularly Judge-made law —grows. It is an essential part of the process of the creation of principles on which predictions can fairly be forecast as a basis for conduct, accountability, or the like. All Judges know that in some cases this latter factor may almost completely transcend the importance of the case which is the vehicle bringing the questions forward."

Anything less than carefully controlled selective employment of decisions without explanations leaves litigants with the impression that the result was reached by fiat, possibly without a clear understanding of the issues by the court. Commission on the Revision of the Federal Court Appellate System, Opinion Writing and Publication at 7 (1974). Concerns such as these may be dealt with more adequately if the bar is permitted to contribute to the development of intermediate court procedures. *Id.* at 11. A better safeguard would be the adoption of the Commission on Revision of the Federal Court Appellate System's recommendations for the statement of reasons in every case:

"[W]e recommend that in every case there be some record, however brief, and whatever the form, of reasoning which impelled the decision. . . . Opinions can be signed or unsigned, published or unpublished, but in each case the litigants and their attorneys would be apprised of the reasoning which underlies the conclusion of the court."

Commission on Revision of the Federal Court Appellate System, Structure and Internal Procedures: Recommendations for Change 73 (1975).

Although the Supreme Court apparently has condoned the practice of summary affirmances by deciding a case in that posture without comment (*Lego v. Twomey*, 404 U.S. 477, 482, n. 6, 92 S.Ct. 619, 623 n. 6, 30 L.Ed.2d 618 (1972); *see also, Taylor v. McKeithen*, 407 U.S. 191, 194 n. 4, 92 S.Ct. 1980, 1982 n. 4, 32 L.Ed.2d 648 (1972)), it has clearly

expressed its dissatisfaction with summary reversals. *Taylor v. McKeithen, supra,* involved a challenge to the 1970 self-reapportionment of the Louisiana Legislature. In a brief summary opinion the Court of Appeals reversed the District Court's findings made after holding hearings on a plan submitted by a specially appointed master. *Bussie v. McKeithen,* 457 F.2d 796 (5th Cir. 1971). The Supreme Court could not determine whether a substantial federal question existed because it was unsure of the Appellate Court's reasoning. It, therefore, vacated the judgment below and remanded the case. Although the Court recognized that courts of appeals should have wide latitude in their decisions of whether or how to write opinions, it observed:

> "But here the lower court summarily reversed without any opinion on a point which had been considered at length by the District Judge."

407 U.S. 191, 194, n. 4, 92 S.Ct. 1980, 1982, n. 4, 32 L.Ed.2d 648 (1972).

New York, so long a leader in judicial administration and the protection of human rights, recognizes the importance of an explanation of appellate decisions in all civil cases. N.Y.C.P.L.R. 5522, as well as predecessor provisions, has provided that, "A court reversing or modifying a judgment or order without opinion shall briefly state the grounds of its decision." In 1975 the requirement was broadened to cover every appeal by adding the word "affirming." 1975 Session Laws of N.Y., ch. 407. We are reliably informed that the New York Court of Appeals has adopted the same practice for itself for criminal appeals. Since, however, the decisions in disbarment cases by the Appellate Division are not, technically, appeals, the Appellate Division was not bound to follow N.Y.C.P.L.R. 5522 in construing Section 90 of the Judiciary Law.

### 2. *Failure of New York Procedure to Meet Minimum Standards of Due Process*

From the discussion of the law and the facts, it is apparent that, as interpreted by the New York courts, Section 90 of the Judiciary Law denies due process to attorneys disciplined by the Appellate Division. The trier, Appellate Division, decides the facts without hearing the witnesses and without the opportunity to determine credibility by observing them testify; it denies counsel the opportunity to orally argue the merits of the case; and it fails to give reasons for its decision, even when it rejects the report of the referees who have heard the witnesses.

In each of the proceedings consolidated in this case, the attorney was afforded a meaningful hearing—but only before the appointed referee to hear and report. The referee—the only judge to see the witnesses and pass on their demeanor—did not decide the case. In contrast, the Appellate Division, sitting as the court of original jurisdiction, acted without hearing the testimony, viewing the parties, observing the confrontation of the witnesses, or listening to arguments of counsel.

It has been suggested that the referee in these proceedings was in fact a "court" even though he sat only as an agent of the Appellate Division. The implication is that the Appellate Division performs a *de facto* reviewing function on a motion to confirm or disaffirm its referee's report. But this is clearly not the case.

First, although the Appellate Division has power to review questions of fact on appeal from the decision of a court in a non-jury case, it must attach considerable weight to the trial court's judgment. As the New York Court of Appeals put it in *People ex rel. MacCracken v. Miller,* 291 N.Y. 55, 61, 50 N.E.2d 542, 544 (1943):

> "In all cases the appellate court in appraising the weight of evidence must recognize that its power to reverse a finding of the trial court is not unlimited, and that the Trial Judge who has seen and hear the witnesses and has opportunity to question them and to guide the course of the trial, has often an advantage over the Appellate

Judge who must reach his conclusion upon the written record alone. So this court has pointed out that, however broad may be the statutory grant of power to the Appellate Division to determine an appeal upon the merits both as to matters of law and fact, its 'power to reverse a finding of fact may be exercised only in accordance with the general rules of law regulating appeals to that court. It may not set aside a finding of value made at Special Term, unless such finding is based upon erroneous theory of law or erroneous ruling in the admission or exclusion of evidence or unless it appears that the court at Special Term has failed to give to conflicting evidence the relative weight which it should have and thus has arrived at a value which is excessive or inadequate.' "

More recently, in *Collins v. Wilson*, 40 A.D.2d 750, 751, 337 N.Y.S.2d 541, 542 (4th Dept. 1972), the Appellate Division declared:

"*We should not disturb findings* based upon conflicting evidence and involving credibility of witnesses *unless it is obvious that the court's conclusion could not be reached by any fair interpretation of the evidence.*"

*See also, e. g., Billington v. State*, 33 A.D.2d 822, 823, 305 N.Y.S.2d 737, 739 (3d Dept. 1969).

In the case of professional misconduct by physicians, chiropractors, engineers, and all others covered by New York Education Law Sections 6500, 8208, review by the Appellate Division is limited by the substantial evidence test as to the facts determined by the Board of Regents. N.Y.Educ.Law § 6510(4); *see, e. g., Matter of Tompkins v. Bd. of Regents*, 299 N.Y. 469, 474, 87 N.E.2d 517 (1949); *Corwin v. Nyquist*, 37 A.D.2d 656, 322 N.Y.S.2d 405, 407 (3d Dept. 1971).

By contrast, the decision of a referee to hear and report, such as the referee in an attorney disciplinary proceeding, is in no way binding upon the Appellate Division. It is free to substitute its own views and findings for those proposed by the referee, for it, not the referee, is the original trier. *See, e. g., Matter of Gehr v. Bd. of Education of City of Yonkers*, 304 N.Y. 436, 440, 108 N.E.2d 371 (1952); *In Re Broome*, 13 A.D.2d 657, 213 N.Y.S.2d 821, 822–23 (2d Dept.), *rev'd on other grounds*, 10 N.Y.2d 942, 224 N.Y.S.2d 21, 179 N.E.2d 862 (1961).

Second, if the referee were in fact a "court" then in cases such as Levin's and Mildner's where the Appellate Division "reverses" its referee and makes a new "finding of fact," the aggrieved attorney woud have an automatic right of appeal on all questions of law and fact to the Court of Appeals. N.Y.C.P.L.R. 5601(a)(ii); 5501(b). But attorneys in this position do not have this right precisely because the referee is not a "court" under the statute. It would be otherwise if the referee in an attorney disciplinary proceeding were designated to hear and *determine*. N.Y.C.P.L.R. 4001 and 4301.

Third, if the Appellate Division were hearing an appeal, it would have to "state the grounds of its decision." N.Y.C.P.L.R. 5522. As already noted, this requirement is not applicable to decisions on disbarment precisely because the proceedings in the Appellate Division are not appeals.

Finally, the State has conceded—nay, urged—that the referee in an attorney disciplinary proceeding is not a court and, further, that the proceedings in the Appellate Division are not an appeal or review. (Defendant's Brief 3 n. and 23):

"Referee Silberman [the referee in Levin's case] was only that—appointed by the Appellate Division, as an arm of that court, to hear and report his recommendations. . . . Obviously the implication is that Referee Silberman decided the proceeding, which he did not and could not. Another implication is that the motion to confirm the referee's report was an appeal, which it was not.

. . . . . .

[Although] the referee, Morton B. Silberman happens to be a Justice of the Supreme Court, he was not acting as such when he was designated to serve as referee to 'hear and report' in Levin's (and Gerzof's) disciplinary proceedings. As such, Silberman was acting as an arm of the Appellate Division. He acts pursuant to CPLR 4320."

In attorney disciplinary proceedings due process requires a hearing by and before the tribunal with the power to decide and punish. The Supreme Court has found such a hearing to be an important "trial right" without which such fundamental due process guarantees as confrontation and a fair hearing would be devoid of substance. *Barber v. Page,* 390 U.S. 719, 721, 88 S.Ct. 1318, 1320, 20 L.Ed.2d 255 (1968); *Berger v. California,* 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969). *See also Williams v. State of Maryland,* 375 F. Supp. 745, 756–57 (D.Md. 1974).

Speaking of a decision on a motion to suppress, the Ninth Circuit noted the dangers in separating the person who sees the witnesses and the one who makes the decisions:

"Requiring the district court to re-hear the evidence if it decides not to follow the recommendations of the magistrate insures that any decision on the facts will be the result of first-hand observation of witnesses and evidence. The law has long recognized the value of these more immediate impressions, and gives them a measure of protection from easy modifications made on the basis of dry records. . . . A rule of law permitting the district judge to assign evidentiary hearings to a magistrate, and then disregard the recommendation of the magistrate without hearing any testimony or seeing any evidence, would fly in the face of traditional legal respect for findings of fact made on the basis of full participation in the methods recognized as most effective for determin-ing facts. When the vindication of important legal rights necessarily hangs in the balance, the law must require whatever is essential to preserve the integrity of the fact-finding process. The method most widely recognized as effective in that regard is imposition of the requirement that the fact-finder actually observe the evidentiary process so as to properly weigh and appraise testimony. . . .

Since the magistrate sees and hears the evidence, the district court is entitled to rely upon his recommendations when making its decision on the motion. If, however, the district court chooses to reject the recommendation of the magistrate, it must itself hear the testimony and see the evidence before deciding the motion. Permitting the district court to simply review dry records or listen to tape recordings of the evidentiary hearing conducted by the magistrate would not satisfy the high standard which must be set for factual determinations which by themselves can decide the outcome of a criminal trial. The defendant is entitled to the assurance that important factual conclusions will be drawn from the testimony and other evidence itself. That assurance is provided if the district court decides the motion in accordance with the recommendations of a judicial officer who observed the evidence. It is certainly provided if the district court sees and hears the evidence itself. But it is just as certainly absent if the district court is allowed to disregard the recommendation of the magistrate and decide the motion only on the basis of dry records . . . ."

*United States v. Bergera,* 512 F.2d 391, 393–94 (9th Cir. 1975).

In the only case directly in point that we have found, a federal court has ruled that a state court's order of suspension of an attorney should not be recognized by a federal court where the state procedure did not permit an opportunity to be heard before the court and thus was

lacking in due process. *In Re Noell,* 93 F.2d 5 (8th Cir. 1937). In this case, following the filing of charges against the attorney, the court appointed a commissioner to hear and report his findings of fact and recommendations. He recommended a two year suspension and transmitted the testimony and briefs to the court. The parties were permitted to make exceptions, but there were no oral or written arguments.

> "Without argument, without a hearing, without affording the respondent an opportunity to be heard, that court overruled all exceptions to the commissioner's report and entered the order of suspension . . . ."

*Id.* at 6.

The Missouri statute, like Section 90 of the Judiciary Law, provided that the court had the power to disbar or suspend, although it could appoint a commissioner to hear evidence. The suggestion was made there, as it has been made by defendants here, that the requirements of due process were satisfied by the combination of the hearing before the commissioner and the briefs available to the court. This argument was rejected:

> "[T]he hearings before the commissioner were not hearings before the court. . . . [I]t is apparent that that court at no time afforded the respondent an opportunity to be heard before it upon the merits of the controversy which it alone had power to determine."

*Id.* at 7. *Cf. In Re Schlesinger,* 404 Pa. 584, 172 A.2d 835, 842 (1961).

Admittedly, the court in *Noell* did not even have the advantage of having written briefs specifically directed toward the ultimate disposition. But this additional factor in the cases before us cannot remedy the lack of due process afforded these attorneys:

> "[They] were entitled to a trial of the issues and that means nothing less than that the trier of the facts should hear the evidence. This important constitutional right is the essence of our system of justice and its denial

is a violation of the guarantee of due process."

*United States v. Vater,* 259 F.2d 667, 674 (2d Cir. 1958) (Lumbard, J., dissenting). Without hearing arguments of counsel, the Appellate Division, after merely reading a cold record, substituted its own view in Mr. Levin's and Mr. Mildner's cases, for that of its referee. Although, in Mr. Gerzof's proceeding, the Appellate Division essentially adopted its referee's report, he, too, was deprived of a meaningful hearing before the trier of fact.

### C. *Appellate Review*

#### 1. *Due Process Requirement*

This finding, moreover, affects the plaintiff's claim that New York's failure to accord attorneys an appeal as of right from an adverse decision by the trier-of-fact is a denial of due process. While it is generally true that due process does not require a state to provide litigants with appellate review, the same is not true where, as here, the state has failed to provide for a full and fair hearing in the court of original jurisdiction. As the Supreme Court stated in *Ohio ex rel. Bryant v. Akron Metropolitan Park District,* 281 U.S. 74, 80, 50 S.Ct. 228, 230, 74 L.Ed. 710 (1930):

> "As to the due process clause of the Fourteenth Amendment, it is sufficient to say that, as frequently determined by this court, the right of appeal is not essential to due process, provided that due process has already been accorded in the tribunal of first instance."

*See also, e. g., Lindsey v. Normet,* 405 U.S. 56, 77, 92 S.Ct. 862, 876, 31 L.Ed.2d 36 (1972). "A fair trial in a fair tribunal is a basic requirement of due process," *In Re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955), and if it is not afforded at the trial level, corrective action by way of appeal must be possible.

### 2. *Failure to Give Due Process at Trial or Appellate Level*

The Appellate Division does not afford a party one fair hearing; it may impose discipline without ever hearing testimony or arguments of counsel, and without ever observing the witnesses or parties. In such cases, the Fourteenth Amendment would at least require the state to give the attorney the process due him through appellate review. The New York attorney disciplinary statute does not provide review for all attorneys aggrieved by the Appellate Division's decision.

The statute has another defect. It permits the Appellate Division to reverse its referee's report and severely punish an attorney without stating the evidence it relies on or the reasons for its decision. This strikes at the very heart of due process. It not only may promote arbitrariness by the decision maker; it makes detection of arbitrary conduct more difficult in any review of the decision.

In Mr. Mildner's case the Appellate Division's opinion made no detailed factual findings, but rather, in conclusory fashion stated: "In our opinion, contrary to the report, all three charges are fully sustained by the proof." *In Re Mildner*, 43 A.D.2d 350, 351, 352 N.Y.S.2d 13, 14 (2d Dept. 1974). Although the Appellate Division affirmed its referee's report in all other respects, in Mr. Levin's case, it also reversed one charge in a summary ruling, thereby discrediting Justice Silberman's conclusion that "[a] thorough analysis of the evidence leads me to the conclusion that the charges against [Levin] are supported by little more than conjecture and surmise." Report and Findings of Justice Morton Silberman, In the Matter of Levin, at 63 (August 31, 1973). In neither case was any explanation given for the adverse decision or for the severe sanction imposed. Without some explanation for the decision to discipline, attorneys in the future will be unable to know what constitutes professional misconduct. Unless there are ascertainable standards, attorney discipline may be abusive and unjust. *Cf*. Lawyer Discipline Needs Improvement, N.Y. State Bar News 5 (Feb. 1975).

Whether the Appellate Division proceedings are likened to those of a court of first instance stating its decision or to those of a court reviewing an administrative agency or board's determination, or to judicial appellate review, some statement of the basis for its decision must be given. The obligations of an appellate court to articulate its reasoning when reversing a trial court are substantial. Surely, the responsibilities of the Appellate Division, sitting as a court of original determination, are as great. If the court finds it administratively convenient to first refer disciplinary actions to referees for a report, it must still, as the body with the power to decide, state its reasons in reaching its own decision.

## V. EQUAL PROTECTION

Plaintiffs also contend that the failure of the New York statutory procedure to provide an appeal as of right from the determination of the Appellate Division denies them the equal protection of the laws in that all other New York litigants have one appeal as of right from the determination of the original fact finder.

### A. *Right to Appeal in New York*

As one of New York's most distinguished judges recently wrote, in this state:

> "The notion is firmly rooted that a litigant is entitled to at least one review of a final decision."

Hopkins, The Role of an Intermediate Appellate Court, 41 Bklyn.L.Rev. 459, 463 (1975).

Civil litigants, following a decision from the court of original jurisdiction, such as the Supreme Court, the County Court or the Family Court, may appeal to the Appellate Division where questions of law and fact are reviewed. *See* Appendix B, *infra*. Criminal defendants also have at least one appeal as of right, with a similar scope of review. *Ibid.*

Moreover, when other professionals, such as physicians, chiropractors, pharmacists, and engineers are disciplined, the Appellate Division hears appeals from the decision of the Board of Regents. *Ibid.* It may review all questions of law and the facts according to the "substantial evidence" standard. *See, e. g., Corwin v. Nyquist,* 37 A.D.2d 656, 322 N.Y. S.2d 405 (3d Dept. 1971); *Miller v. Board of Regents of University of State of N. Y.,* 30 A.D.2d 994, 294 N.Y.S.2d 29 (3d Dept. 1968).

Attorneys, on the contrary, have no parallel rights. Pursuant to the New York attorney disciplinary statute, aggrieved attorneys are entitled to a review as of right only when the Court of Appeals finds constitutional questions controlling or, apparently, when an Appellate Division Justice dissents. N.Y. Jud.Law § 90(8); N.Y.C.P.L.R. 5601. Even if such an appeal is granted, the Court of Appeals' review is severely limited. It may review questions of law, but it will affirm the disciplinary decision if there is "some evidence" to support it, substantial or not. *See Matter of Goodman,* 199 N.Y. 143, 144, 92 N.E. 211 (1910); *See also, Del Bello v. Westchester County Bar Ass'n.,* 19 N.Y. 2d 466, 472, 280 N.Y.S.2d 651, 655, 227 N.E.2d 579 (1967); *Matter of Flannery,* 212 N.Y. 610, 106 N.E. 630 (1914); *Matter of Robinson,* 209 N.Y. 354, 359, 103 N.E. 160 (1913). For an analysis of the pertinent statutes relating to the right to appellate review for all litigants in New York see Appendix B.

Even the English system, upon which our disciplinary system is modeled, provides for an appeal from the findings and order of the Disciplinary Tribunal to a divisional court of the Queen's Bench Division, and from there with leave to the House of Lords. P. A. Leach, The New Look in Disciplinary Enforcement in England, 61 A.B.A.J. 212, 213 (1975).

### B. *Nature of Appellate Review*

Although a state need not provide a right to appeal, *Griffin v. Illinois,* 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956), our system of justice relies heavily on appellate review. Once a state provides an appellate process, it may not arbitrarily deny an appeal to a selected class of litigants:

"When an appeal is afforded . . . it cannot be granted to some litigants and capriciously or arbitrarily denied to others without violating The Equal Protection Clause."

*Lindsay v. Normet,* 405 U.S. 56, 77, 92 S.Ct. 862, 876, 31 L.Ed.2d 36 (1972). *See also, e. g., National Union of Marine Cooks & Stewards v. Arnold,* 348 U.S. 37, 43, 75 S.Ct. 92, 95, 99 L.Ed. 46 (1954).

Llewellyn has characterized the appellate courts as the "central and vital symbol of The Law." K. Llewellyn, The Common Law Tradition: Deciding Appeals 4 (1960). Over 150 years ago, Senator Clinton declared his position in an appeal heard by the New York State Senate:

"In order to guard against the fallibility of the human understanding, and to shield the citizen from the attacks of injustice, it may be regarded as a cardinal principle in our land, that no single tribunal is intrusted with the sole determination of a man's property."

*Yates v. People,* 6 Johns. 337, 455 (1810).

The New York Court of Appeals, quoting *Yates,* stated that

"our law considers it an essential right of a suitor to have his cause examined in tribunals superior to those in which he considers himself aggrieved."

*Matter of Luckenbach,* 303 N.Y. 491, 496, 104 N.E.2d 870 (1952). *See also, Handy v. Butler,* 183 App.Div. 359, 169 N.Y.S. 770 (2d Dept. 1918). And the court in *People v. Becker,* 108 Cal.App. 2d 764, 239 P.2d 898, 901 (1952), observed that

"[t]he right of every man to his day in court is not limited to the trial court but embraces as well his day in the appropriate reviewing court."

All the states have recognized the importance of appellate review to a correct adjudication in criminal matters by providing some method of appeal from a criminal conviction. *Griffin v. Illlinois,* 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956). Statistics show that a substantial proportion of criminal convictions are reversed by state appellate courts. *Id.*

An analysis of the functions of appellate courts reveals their significant role. As Professor Kurland puts it:

> "Any appellate court has at least three distinct functions to perform. The first is that of correcting erroneous decisions rendered by judicial tribunals inferior to it in the judicial hierarch. The second is to maintain a consistency among the decisions of these lower courts subordinate to it, so that the law is evenhandedly applied within the system. The third is the lawmaking function of creating and amending rules of law, not only so that they may be followed by lower courts within the system, but also to provide guidance to lawyers and their clients as to the propriety of their behavior, their obligations, their duties, their rights, and their remedies."

Kurland, Jurisdiction of the United States Supreme Court: Time for a Change? 59 Cornell L.Rev. 616, 618 (1974). Of particular interest in this case is this last function—to speak directly to the litigants about their claims. Since no appeal was granted, this appellate obligation was never met. Moreover, the Appellate Division, the trier of fact, never apprised the losing parties as to why the referees' reports had been affirmed or reversed, or in what way their behavior had been improper. The law must not only do justice, but it must show that it does justice. Lasky, Observing Appellate Opinions From Below the Bench, 49 Calif.L.Rev. 831, 835 (1961).

### C. Unconstitutionality of Classification of Attorneys As Not Entitled to Appeals

Separate treatment of attorneys in providing a right to appellate review is unconstitutional only if, according to the traditional formulation, the classification does not bear a rational relationship to a legitimate governmental objective. *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911).

> "[T]he classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike."

*F. S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561–62, 64 L.Ed. 989 (1920).

Where appropriate, a legislature may regulate different professions in different ways. Thus in ruling that an act regulating dental advertising was not unconstitutionally discriminatory the Supreme Court stated:

> "Nor has plaintiff any ground for objection because the particular regulation is limited to dentists and is not extended to other professional classes. The state was not bound to deal alike with all these classes, or to strike at all evils at the same time or in the same way. It could deal with the different professions according to the needs of the public in relation to each."

*Semler v. Oregon State Board of Dental Examiners,* 294 U.S. 608, 610, 55 S.Ct. 570, 571, 79 L.Ed. 1086 (1935).

The state presents three purposes which it believes justify its distinctive treatment of disciplined attorneys. First, it argues that attorneys are simply not fungible with other professionals. The state, therefore, may provide different disciplinary machinery for other professions, including the right of ap-

peal, but such reviewing methods are neither appropriate nor necessary in the disciplinary proceedings of lawyers.

The state seeks to analogize its reasoning with respect to attorney discipline procedures to that upheld by the Second Circuit with respect to the procedures for revocation of a teaching certificate. *Pordum v. Board of Regents of State of New York*, 491 F.2d 1281 (2d Cir.), *cert. denied*, 419 U.S. 843, 95 S.Ct. 74, 42 L.Ed. 2d 71 (1974). In that case Pordum argued that he could not be removed from the classroom during the three to four week period preceding a hearing concerning his fitness to teach. In upholding the statutory procedure the court recognized that

> "[t]he teaching profession differs from these other professions in many respects, including the special vulnerability of the client population, the high duty of care owed by the state to that group, and the unique responsibility which the state has to provide an effective system of education. These distinctions justify the legislative determination that different treatment with respect to the disciplining of the different professionals is required."

*Id.* at 1286.

The state here, however, fails to present distinctions which justify the legislative choice to deny attorneys an appeal as of right. It is true that the state has a high duty "to preserve public confidence in the judicial institution and to protect the courts and public from misconduct." Note, The Imposition of Disciplinary Measures for the Misconduct of Attorneys, 52 Colum.L.Rev. 1039 (1952). But it owes a similar duty to protect the public from other unfit professionals—doctors, pharmacists, and architects—who can also cause great injury. In *Pordum* the court was concerned with the necessity of an immediate, as opposed to a slightly delayed, hearing. In this case we are concerned with the procedural safeguard of an appeal from a final decision imposing a grievous sanction. The state gives no reasons for denying this important right to attorneys while affording it to all other litigants, including all other professionals.

The state's reliance on the separate procedures for the disciplining of judges is misplaced. The problem of disciplining judges is not the same as that of disciplining lawyers. Even should a trial judge be removed following discipline he still may continue to practice his profession. *Compare Friedman v. State of New York*, 24 N.Y.2d 528, 301 N.Y.S.2d 484, 249 N.E.2d 369 (1969), *with* Vol. III, Martindale-Hubbell Law Directory 1132. (1975). *Cf.* amendment to N.Y. Const., Art. 6, § 22(j) submitted to the people for approval, November 4, 1975. By contrast, when a lawyer loses his license to practice he loses his ability to earn a living in the way that he is trained to do.

Second, the state contends that since the initial decision against other professions, unlike attorneys, is rendered by an administrative body, they are more in need of judicial review. This is accomplished by Article 78 proceedings, in which the review afforded by the Appellate Division is akin to ordinary judicial appellate review. *See* Cohen & Karger, Powers of the New York Court of Appeals, § 51 at 233 (rev. ed. 1951). This conclusion is unjustified; the state presents no evidence that initial determinations in non-attorney cases, rendered after a full due process hearing, are more prone to error than initial judicial decisions in attorney cases. The state chose to place attorney discipline in judicial hands in the first instance. It cannot use this decision to rationalize depriving attorneys of the same rights of review it grants to all other professionals. The special relationship between courts and counsel may justify entrusting attorney discipline to the judiciary, but it does not justify giving attorneys fewer rights than their peers in other professions.

The state's final argument is that the statutory procedure affords the neces-

sary swift discipline. "The establishment of prompt efficacious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in constitutional adjudication." *Stanley v. Illinois*, 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972). But all professionals and other citizens who deviate from prescribed standards of conduct must be disciplined swiftly and effectively to protect the public from fraud and other harm. Yet the state fails to give any reason why only allegedly deviant attorneys must be denied the right of appellate review.

Since the state subjects attorneys to the judicial process, equal protection requires it to give those attorneys the same appellate rights as it gives to all others subject to the judicial process unless it can defend its decision by a "legitimately defensible difference." Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205, 1223 (1970). The denial of appellate review is a substantial deprivation, the state's burden is great; it cannot cavalierly "bolt the door to equal justice." *Griffin v. Illinois*, 351 U.S. 12, 24, 76 S.Ct. 585, 593, 100 L.Ed. 891 (1956) (Frankfurter, J., concurring). All people charged with misconduct must, so far as the law is concerned, "stand on an equality before the bar of justice in every American court." *Chambers v. State of Florida*, 309 U.S. 227, 241, 60 S.Ct. 472, 479, 84 L.Ed. 716 (1940).

## VI. ALTERNATIVES TO DENIAL OF DUE PROCESS AND EQUAL PROTECTION

It is appropriate to consider alternatives to the state's present procedure which might give additional protection to the lawyer without adding to the burdens of the state courts. If the state can, without undue inconvenience, meet its substantive goals, the excuse for constitutionally suspect procedures becomes impossible to justify.

We do recognize that the New York Court of Appeals, as the highest appellate court in the state, is, not unlike the Supreme Court of the United States, heavily burdened with appeals. *See* Hopkins, Small Sparks from a Low Fire: Some Reflections on the Appellate Process, 38 Bklyn.L.Rev. 551 (1972). Thus, a requirement by this court, implied or explicit, that a full appeal to the Court of Appeals be required would certainly be uncalled for and quite burdensome to the state judicial system.

On the other hand, it would be simple to amend the statute by designating as statutory trier of fact the Supreme Court Justice who now acts only as a referee. Provision for a referee "to *determine*," as opposed to a referee simply "to *report*," already exists in New York law. N.Y.C.P.L.R. 4001, 4301, 4320. The decision of such a referee stands "as the decision of a court," N.Y.C.P.L.R. 4319, and is reviewable on appeal as all other court decisions in New York. *See* N.Y. C.P.L.R. 5016(c). Or, the New York Supreme Court at nisi prius, as opposed to the Appellate Division, could be made the tribunal of original jurisdiction—as it already is in most other judicial proceedings.

In either event, an appeal could be taken from the decision of the Supreme Court Justice to the Appellate Division which would then sit in its usual capacity as a court of review, with the normal deference to the trial judge. There would be the same effective kind of protection as is now available to all other professionals in the state without adding to the burden of the state system. The trial judge would, under the New York Civil Practice Law and Rules, be required to set forth his reasons for decision and in accordance with the normal practice the appellate court would hear oral argument and prepare an appellate decision.

---

## VII. RETROACTIVITY

This new procedure need not necessarily upset any disciplinary or disbarment decisions other than those presently before us. The question of retroactiv-

ity may be examined under the criteria used for newly recognized constitutional rules of criminal procedure. *Cf.* Note, Retroactivity in Civil Suits: *Linkletter Modified,* 42 Ford.L.Rev. 653 (1974). Under this test there are three primary considerations: (1) the purpose to be served by the new standard, (2) the extent of the reliance by courts and law enforcement authorities on the old rule and (3) the effect of retroactive application on the administration of justice. *See, e. g., Stovall v. Denno,* 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967); *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); *Blackburn v. Cross,* 510 F.2d 1014 (5th Cir. 1975); *United States v. Liguori,* 438 F.2d 663, 668–76 (2d Cir. 1971). None of these criteria require retroactivity here. Nor, in view of the assumption of judicial regularity in decisions of the Appellate Division need we find that current practice "raises serious questions about the accuracy of guilty verdicts in past trials." *Williams v. United States,* 401 U.S. 646, 653, 91 S. Ct. 1148, 1152, 28 L.Ed.2d 388 (1971). *See also, e. g., Adams v. Illinois,* 405 U. S. 278, 278–83, 92 S.Ct. 916, 918–919, 31 L.Ed.2d 202 (1972). State judges and attorneys have relied upon the present procedure for a long period and retrospective application would, it could be found, be seriously burdensome and disruptive.

These changes would vindicate the rights of New York attorneys to due process without requiring a major upheaval in the state's method of disciplining them. They would call only for the introduction of procedural safeguards which are already required and in existence in New York for everyone but attorneys. They would not lower the standard of conduct to which attorneys are held. It is in no way inconsistent with other proposals to improve disciplinary procedures in New York. *See* 18th Annual Report, Jud.Conf. of N. Y., Leg.Doc. No. 90, "Disciplinary Enforcement Against Attorneys in New York: An Evaluation and Recommendations," 234 ff. (1973).

## VIII. CONCLUSION

The New York statutory disciplinary procedure denies accused attorneys due process of law. It permits the court of original jurisdiction to rule without holding a full and fair hearing or stating the reasons for its decision and then fails to provide for an appeal as of right from this determination. When a court has the awesome power of determining the validity of charges affecting an attorney's reputation and livelihood, it must scrupulously adhere to procedural due process. There is a pressing need to protect the public from unethical attorneys, but a state may not in its zeal to discipline them ignore the requirements of the United States Constitution. The law also is unconstitutional in denying attorneys the equal protection of an appeal permitted all other professionals. Section 90 of the Judiciary Law, as interpreted by the New York courts should be declared unconstitutional.

See Appendix A on next page.

Appendix A

## THE NEW YORK ATTORNEY-DISCIPLINARY STATUTE:
### NEW YORK JUDICIARY LAW § 90,
### SUBDIVISIONS 2, 3, 6, 7, 8 AND 9

"§ 90. *Admission to and removal from practice by appellate division; character committees*

\* \* \* \* · \* \* \* \* \* \* \*

"2. The supreme court shall have power and control over attorneys and counsellors-at-law and all persons practicing or assuming to practice law, and the appellate division of the supreme court in each department is authorized to censure, suspend from practice or remove from office any attorney and counsellor-at-law admitted to practice who is guilty of professional misconduct, malpractice, fraud, deceit, crime or misdemeanor, or any conduct prejudicial to the administration of justice; and the appellate division of the supreme court is hereby authorized to revoke such admission for any misrepresentation or suppression of any information in connection with the application for admission to practice.

"It shall be the duty of the appellate division to insert in each order of suspension or removal hereafter rendered a provision which shall command the attorney and counsellor-at-law thereafter to desist and refrain from the practice of law in any form, either as principal or as agent, clerk or employee of another. In addition it shall forbid the performance of any of the following acts, to wit:

"a. The appearance as an attorney or counsellor-at-law before any court, judge, justice, board, commission or other public authority.

"b. The giving to another of an opinion as to the law or its application, or of any advice in relation thereto.

"In case of suspension only, the order may limit the command to the period of time within which such suspension shall continue, and if justice so requires may further limit the scope thereof.

"If an attorney and counsellor-at-law has been heretofore removed from office, the appellate division shall upon application of any attorney and counsellor-at-law, or of any incorporated bar association, and upon such notice to the respondent as may be required, amend the order of removal by adding thereto as a part thereof, provisions similar to those required to be inserted in orders hereafter made.

"If a certified copy of such order or of such amended order, be served upon the attorney and counsellor-at-law suspended or removed from office, a violation thereof may be punished as a contempt of court.

"3. The suspension or removal of an attorney or counsellor-at-law, by the appellate division of the supreme court, operates as a suspension or removal in every court of the state.

\* \* \* \* \* \* \* \* \* \* \*

"6. Before an attorney or counsellor-at-law is suspended or removed as prescribed in this section, a copy of the charges against him must be delivered to him personally within or without the state or, in case it is established to the satisfaction of the presiding justice of the appellate division of the supreme court to which the charges have been presented, that he cannot with due diligence be served personally, the same may be served upon him by

mail, publication or otherwise as the said presiding justice may direct, and he must be allowed an opportunity of being heard in his defense. In all cases where the charges are served in any manner other than personally, and the attorney and counsellor-at-law so served does not appear, an application may be made by such attorney or in his behalf to the presiding justice of the appellate division of the supreme court to whom the charges were presented at any time within one year after the rendition of the judgment, or final order of suspension or removal, and upon good cause shown and upon such terms as may be deemed just by such presiding justice, such attorney and counsellor-at-law must be allowed to defend himself against such charges.

"The justices of the appellate division in any judicial department, or a majority of them, may make an order directing the expenses of any disciplinary proceedings, and the necessary costs and disbursements of the petitioner in prosecuting such charges, including the expense of any preliminary investigation in relation to professional conduct of an attorney and counsellor-at-law, to be paid by the county treasurer of a county within the judicial department, which expenses shall be a charge upon such county.

"7. In addition to the duties prescribed by section seven hundred of the county law, it shall be the duty of any district attorney within a department, when so designated by the justices of the appellate division of the supreme court in such department, or a majority of them, to prosecute all proceedings for the removal or suspension of attorneys and counsellors-at-law or the said justices, or a majority of them may appoint any attorney and counsellor-at-law to conduct a preliminary investigation and to prosecute any disciplinary proceedings and, during or upon the termination of the investigation or proceedings, may fix the compensation to be paid to such attorney and counsellor-at-law for the services rendered which compensation shall be a charge against the county specified in his certificate and shall be paid thereon.

"8. Any petitioner or respondent in a disciplinary proceeding against an attorney or counsellor-at-law under this section, including a bar association or any other corporation or association, shall have the right to appeal to the court of appeals from a final order of any appellate division in such proceedings upon questions of law involved therein, subject to the limitations prescribed by . . . the constitution of this state.

"9. No objection shall be taken to the appointment of any member of the bar to act as referee or judge in a disciplinary proceeding under this section on the ground that he is a member of a bar association or other corporation or association which is the petitioner therein."

See Appendix B on next page.

## Appendix B

### THE RIGHT TO APPELLATE REVIEW IN NEW YORK

#### A. Professionals

| Profession | Statutory Trier-of-Fact | Court of Appellate Review as of Right | Scope of Appellate Review as of Right |
|---|---|---|---|
| 1—Attorneys | Appellate Division (Judiciary Law § 90) | Court of Appeals (Judiciary Law § 90(8)) | None as to facts; none as to law except when a Constitutional issue is the only question or apparently when a Justice of the Appellate Division dissents |
| 2—Physicians, Chiropractors, Engineers, Accountants, Nurses, and all others covered by Education Law § 6500–8208 | Board of Regents (Education Law § 6510(3)) | Appellate Division, Third Department (Education Law § 6510(4)) | All questions of law and "substantial evidence" test as to facts |

#### B. Civil Litigants

| Statutory Trier-of-Fact | Court of Appellate Review as of Right | Scope of Appellate Review as of Right |
|---|---|---|
| 1—Supreme Court | Appellate Division (CPLR 5701(a)) | Questions of law and questions of fact (CPLR 5501(c)) |
| 2—County Court | Appellate Division (CPLR 5701(a)) | Questions of law and questions of fact (CPLR 5501(c)) |
| 3—Family Court | Appellate Division (Family Court Act § 1111) | Questions of law and questions of fact (CPLR 5501(c)) |
| 4—Surrogate's Court | Appellate Division (Surrogate's Court Act § 2701) | Questions of law and questions of fact (CPLR 5501(c)) |
| 5—Court of Claims | Appellate Division Third or Fourth Department (Court of Claims Act § 24) | Questions of law and questions of fact (Court of Claims Act § 24) |
| 6—District Court | Appellate Term or County Court (Uniform District Court Act § 1701) | Questions of law and questions of fact (CPLR 5501(d)) |

| Statutory Trier-of-Fact | Court of Appellate Review as of Right | Scope of Appellate Review as of Right |
|---|---|---|
| 7—Civil Court, City of New York | Appellate Division or Appellate Term (N.Y.C. Civil Court Act § 1701) | Questions of law and questions of fact (CPLR 5501(d)) |
| 8—Other City Courts | Appellate Term or County Court (Uniform City Court Act § 1701) | Questions of law and questions of fact (CPLR 5501(d)) |
| 9—Justice Court | Appellate Term or County Court (Uniform Justice Court Act § 1701) | Questions of law and questions of fact (CPLR 5501(d)) |

## C. Criminal Defendants

| Statutory Trier-of-Fact | Court of Appellate Review as of Right | Scope of Appellate Review as of Right |
|---|---|---|
| 1—Supreme Court | Appellate Division (CPL § 450.60(1)) | Questions of law and issues of fact (CPL § 470.15(1)) |
| 2—County Court | Appellate Division or Appellate Term (CPL § 450.60(2)) | Questions of law and issues of fact (CPL § 470.15(1)) |
| 3—District Court | County Court or Appellate Term (CPL § 450.60(3)) | Questions of law and issues of fact (CPL § 470.15(1)) |
| 4—Criminal Court, City of New York | Appellate Division or Appellate Term (CPL § 450.60(4)) | Questions of law and issues of fact (CPL § 470.15(1)) |
| 5—Other City Courts | County Court or Appellate Term (CPL § 450.60(3)) | Questions of law and issues of fact (CPL § 470.15(1)) |
| 6—Justice Court | County Court or Appellate Term (CPL § 450.60(3)) | Questions of law and issues of fact (CPL § 470.15(1)) |